# CHARLESTON.

### JACKSON v. WHEELING TERMINAL RY. Co. et al.

Submitted June 6, 1908.   Decided March 30, 1909.

1. MASTER AND SERVANT—*Promulgation of Rules—Sufficiency.*

   In adopting and using the standard railroad rules, generally observed in the operation of railroads, so far as they are applicable to its business, a railroad company sufficiently discharges the legal duty to protect its employes from injury by the promulgation and enforcement of rules for that purpose. (p. 419.)

2. SAME.

   The necessity for such rules and the character thereof depend on the nature and extent of the master's business, and such of the approved rules as apply to classes of trains and railroad operations, not used in the business, may be discarded or ignored. (p. 421.)

3.  SAME—*Injuries to Servant—Measure of Master's Duty.*

The measure of the master's duty to the servant, in respect to affirmative action for his safety, depends upon the extent to which he is allowed opportunity, and has the means or power for his own protection. As limitations are imposed upon him and his freedom restrained, his power of self-protection is diminished, and the master's duty increased. As limitations and restraints are removed, withheld or relaxed, the servant's power of self-protection is enlarged and the duty of the master correspondingly reduced. (p. 424.)

4.  SAME—*Promulgation of Rules—Reasonableness.*

In view of the duties imposed, by the standard railroad rules, upon train crews for their own protection and that of their fellow servants, the provision in· said rules for running two or more trains, one after another, in the same direction, over a single track, without giving the crews thereof telegraphic information of the relative position's of the trains, is reasonable and not violative of duty. (p. 426.)

5.  SAME—*Duty to Promulgate Rules.*

A railroad company operating only a small terminal railroad, is not bound to run scheduled or limited trains,· nor to adopt or observe rules applicable to such trains. It may require all of its trains to run extra and be kept under control in the sense that they may be instantly stopped to avoid collision or other causes of injury, and devolve upon the crews the duty of protecting themselves and one another by their diligence, caution, prudence and the use of the signals prescribed by the standard rules. (p. 425.)

6.· SAME—*Injuries to Servant—Rules—Superseding.*

The partial supersession of yard limit rules, by the adoption and use of certain orders inconsistent therewith, does not wholly dispense with them. They still apply in a modified form. (p. 425.)

7.  SAME—*Operation of Terminal Railroad.*

If a company, operating its road under yard or yard limit rules, forbids the running of trains over a certain portion of the road without orders, limiting them in respect to the time of starting and requiring them to run extra, and such orders are issued, the trains' receiving them are not thereby scheduled in respect to speed or time, nor their crews relieved from the duty of vigilance and self protection; nor is it negligence to start two such trains in the same direction on a single track in close proximity to one another, without advising the crew of each of the location of, and orders given to, the other. (p. 425.)

8.  SAME—*Injuries to Servant—Contributory Negligence.*

If two trains, running under such orders, are passing through

a tunnel, and the crew of the one following find the tunnel filled
with smoke so dense as to prevent them from ascertaining,
by sight, whether there is a train ahead of them and so close
as to render it dangerous for them to proceed, the presence of
the smoke is sufficient to put them upon inquiry, and it is
their duty to stop, if necessary, and not to proceed until the
track is clear; and, if they fail to do so, and injury to one of
them results, no recovery therefor can be had, since the cause
thereof is the negligence of the person injured and his co-ser-
vants. (p. 427.)

9.   SAME—*Fellow Servants—Who Are.*
     If trains of one railroad company are run over the track of
another, under the complete control of a servant of the latter,
know as a "pilot," the crews of such trains are fellow servants
of the crews, operating the trains of the owner of such track.
(p. 419.)

10.  EXCEPTIONS, BILLS OF—*Insufficiency—Incorporating Evidence.*
     A bill of exceptions is not open to the charge that it does
not contain all the evidence adduced, if it purports to embody
"the evidence" in the case, and the order of the court making
it part of the record describes it as containing "all the evidence"
introduced, such description being consistent with the terms of
the bill and presumed to rest upon knowledge, on the part of
the court, derived from sources other than the bill of exceptions
itself. (p. 418.)

Error to Circuit Court, Ohio County.

Action by Charles G. Jackson against the Wheeling Terminal
Railway Company and another. There was a verdict for plain-
tiff, which was set aside on motion, and he brings error.

*Affirmed.*

DOVENER & FICKEISON and J. J. CONIFF, for plaintiff in error.

J. B. SOMMERVILLE and H. M. RUSSELL, for defendants in
error.

POFFENBARGER, JUDGE:

In an action for damages, resulting from personal injury,
Charles G. Jackson obtained a verdict for the sum of $10,000.00
against the Wheeling Terminal Railway Company and the Balti-
more & Ohio Railroad Company, in the circuit court of Ohio
county, which was set aside on motion, and he obtained a writ
of error to the judgment.

Objection to consideration of the case on its merits is based

upon the contention that the evidence has not been made part of the record, it being urged that the bill of exceptions does not show that the evidence therein embraced is all that was adduced at the trial. The bill of exceptions does not use the word "all." In one place it says the plaintiff "asked the court to sign and seal his bill of exceptions, certifying all of the instructions and the evidence given during the trial of said cause, which is here accordingly done." Following this, there is a caption inserted reading as follows: "Transcript of evidence in case of *Charles. G. Jackson* v. *Wheeling Terminal Co. and B. & O. R. R. Co.*" Below this appears the style of the case and a memorandum showing the names of the attorneys representing the parties. After this appears the following: "Be it remembered that on the trial of this cause, after the jury had been selected and sworn, as in the record is set forth, the following evidence was introduced by the plaintiff and the defendant respectively." But the court, in the order which makes the bill of exceptions part of the record, says the plaintiff "presented to the court his bill of exceptions containing the instructions given in said cause and all the evidence introduced in the trial in said cause." This recital, though in terms descriptive and susceptible of a construction denying it the function of affirmation, is, it must be remembered, part of a solemn court order, possessing higher character than a pleading, and deemed to be true. We may summon to its aid the presumption that the court verified it by personal recollection, the notes taken during the trial and the assent of the parties. It, in no sense, contradicts the bill itself. On the contrary, it accords with the terms thereof, saying it incorporates "the evidence" introduced, and literally importing completeness. *Hall* v. *Hall,* 12 W. Va. 1, invoked to sustain the position taken in the brief, is inapplicable, since it relates to a wholly different subject, namely, how far separate bills of exceptions can be read together or used to sustain, or complete, one another.

The evidence proves, and tends to prove, the following material facts: The Wheeling Terminal Railway Company owns and operates a short terminal railroad by means of which transfers of cars are made from railroad to railroad and between the railroads and shippers in and around the city of Wheeling. Its road passes through a tunnel under what is known as Chapline Hill, 2,473 feet in length. It has its own engines, cars, crews

and officers, including a superintendent and train dispatcher, and operates its road under the standard railway rules and regulations, so far as they are applicable; but, in view of the character of the road and the nature of the company's business, some of the rules are deemed inapplicable. Sometime before the injury complained of occurred, an arrangement was made between the Wheeling Terminal Company and the Baltimore & Ohio Railroad Company, by which the latter was permitted to run its coal trains over the tracks of the former. Whether other railroads were allowed to do likewise, as to any of their trains, is not disclosed. After this arrangement had been made certain railway rules, not previously observed, were put in force. Until that time, it seems the terminal company's trains could enter the tunnel without a special order from the train dispatcher, but afterwards no train was permitted to do so. Before this change was made, only the rules applicable to yards and yard limits were observed. There was one exception under the new order of things. The La Belle Iron Works used exclusively one of the two tracks in the tunnel for storage of cars and ran on it a small engine, popularly known as the "La Belle Buck," for putting in, taking out and shifting them. This engine came and went at its will. On every Baltimore & Ohio train, there was stationed a terminal company employee, known as pilot, while it was passing over the terminal tracks. The orders for such a train were given to the pilot and the train crew obeyed his orders, he observing the orders issued by the dispatcher. No train, while on the terminal tracks, was scheduled as to them. All ran extra, the time of starting alone being fixed in the orders, and each train being expected to pass over the track with such speed as was practicable and consistent with the observance of the rules, prescribing the duties of crews in charge of extra trains. When trains were sent in the same direction over the road, no notice was given to the crew of one, concerning the relative situation of, or the orders given to, the other, and they passed through the tunnel in the order in which they reached it. To such trains orders could be given, complete at the same time and place, the object being to forbid their starting before the time designated in the order, not to require them to start at that time. According to the testimony of several witnesses, qualified by occupation and experience to testify on the subject,

this method of running trains over the same track in the same direction conformed to the rules and practice of railroad operation throughout the Unted States, Canada and Mexico. Of course, such orders are not given to trains, going in opposite directions on the same track, without provision for passing at some point.

On the morning of August 23, 1902, at the station of the terminal company, two orders were given practically at the same time. One was written and delivered right after the other. The first was handed to the conductor of the company's own train, propelled by ·engine No. 3, ordering it to proceed from north to south through the tunnel to what is known as the Pan Handle transfer, distant something less than a mile, and there pick up and bring back a stock car. The other was given to the pilot who was to pass through the tunnel on the train drawn by engine No. 3, and, at the far end thereof, take charge of the B. & O. coal train, propelled by engines Nos. 216 and 218, and having in it 33 cars, and bring that train through the tunnel and conduct it off of the terminal tracks. At the south end of the tunnel, a branch of the terminal road ran southwest a distance of 2,475 feet to the Pan Handle transfer, while another branch ran south about 1,945 feet to the B. & O. railroad, where the train in question came on to the terminal company's track. The pilot, Burke, went through the tunnel on the terminal company's engine in company with the plaintiff, a brakeman, and, on reaching La Belle Junction situated at the south end of the tunnel and at the point at which the road branches in two directions, as above stated, he got off. The B. & O. train was then in sight and moving in the direction of the tunnel. He signalled it to come on, and, when it reached the junction, boarded the front engine, leaving orders at the switch for the rear brakeman. The terminal company's train proceeded to the Pan Handle Junction, picked up the stock car and started back with it, intending to follow the other train through the tunnel on the same track. The B. & O. train was pulled by one engine and pushed by another. As the terminal engine came up, it was running backward and pushing the stock car ahead of it. Plaintiff and another brakeman were standing on the sill of the front end of the car. When the terminal train got well into the tunnel, its crew found it filled with a dense smoke which

rendered it impossible for them to see anything. Proceeding, nevertheless, they passed the center of the tunnel, the highest point in it, and, shutting off the power, drifted some distance when a rear end collision occurred, the stock car being driven against the rear engine of the coal train. The plaintiff was so badly crushed that one leg and some of the toes of the foot of the other had to be amputated. All the crew of the terminal train admit the density of the smoke and their ignorance of the cause of it. Knowing the practice of the La Belle shifter, they say they thought the smoke might have come from it, and also that it might have been the smoke from their own engine, made in previously passing through. The order given to the terminal train became complete at five o-clock, A. M., that is, it could be acted upon after five o'clock, but not before. The train started, according to the testimony, about 5:05. The order for the B. & O. train became complete at 5:16 and reached La Belle Junction in the hands of the pilot, at the south end of the tunnel, at 5:15. The witnesses who were on the B. & O. train say it was running at from five to seven miles an hour at the time of the collision, and, at that rate, the time consumed in passing through the tunnel would have been from four to five and one-half minutes. Burke, the pilot, testifies that, as he went over on the terminal engine, the plaintiff Jackson opened and closed a switch just north of the tunnel and was told by witness not to lock it as he, Burke, wanted to use it when he "came right through." He also says that, when he alighted from the terminal train, at the south end of the tunnel, Jackson said to him "There they are up there waiting on you," and it appears that the B. & O. train was then in sight.

The duty of an employer to formulate and enforce rules to be observed by his servants, as a means of protecting them from injury by the acts of one another, as well as that of common carriers of passengers to do so, for that purpose and also the purpose of safety and protection to the persons carried by them, is asserted by all courts; and there is like unanimity in the decisions to the effect that the necessity for such rules, as well as their nature, depends upon the character and scope of the business. But there are functions to be performed, and conditions to be dealt with, even in an extensive and complex railroad system, not susceptible of control or government by general

rules, respecting all matters of detail. These must be entrusted to the caution and diligence of the employees, using the means provided for such occasions and exigencies, rather than responding to specific directions, given in view of the peculiar conditions. Thus, in *Railroad Co.* v. *Carruthers,* 56 Kan. 309, there is a strong intimation that no system of rules for the control of operations within a railroad yard, descending into all the details of switching, shifting and coupling cars, could be devised and operated with success. In that case, the court declared it incompetent for a jury to charge a railroad company with negligence in failing to prescribe a code of rules or system of signals for the giving of notice or warning of the approach of detached cars in a railroad yard, in the absence of evidence showing that such system would be feasible or useful. In the testimony of witnesses taken in this case, practical railroad men, having had years of experience in railroad operation, repeatedly declare that, in yards and within yard limits, trains run without regard to schedules of time and speed limits, and that the matter of safety to passengers and employes is entrusted to the watchfulness and care of the train crews, a general rule requiring every engine, when in the yards or yard limits, to be brought and kept within the control of the engineer, so that it can be stopped at any time, and the train crews being able to know, by means of observation and communication through the signals prescribed by general rules, such as blasts of the whistle, sounds of the bell and motions of employes, where every train and engine is, and cause it to be handled so as to avoid collision and injuries. Of course, there is not an entire absence of rules. General rules require the engines to be kept under control within the limits as well as provide signals to be observed, and impose upon the brakemen, flagmen and others the duty to be watchful, diligent and prudent as each exigency arises. At the same time, it is to be observed that within these limits trains do not, as a general rule, run on any schedule nor have any exclusive right to the track or right of way. There may be exceptions to this in cases of through trains not stopping at certain stations, but having occasion to pass through yards. A general notice of their time, afforded by their schedules, and an order, requiring the track to be kept clear through the yard, when they are expected to pass, may except them from the general rule and so supersede what are

known as yard limits. It is easy to perceive, too, that even on the main line the safety of trains may be entrusted, to some extent, to duties imposed upon the train crews, rather than to instructions from the train dispatcher, without any violation of duty on the part of the company. There are many miles of space between stations on the lines of some railroads so that, in case of delay between them, caused by accident, it could not be known at the managing office, until the time for arrival had passed, there being no means of communication with the stations from any point between them. If two or more trains, following one another, were not permitted to enter upon such a space, it would result in hours of delay, loss in operating expenses and inconvenience to the general public. As the ingenuity of railroad men has devised means of enabling them to do so, with perfect, or at least reasonable, safety, this loss of time and inconvenience becomes unnecessary and, therefore, the law does not inflict it. Experience has demonstrated that, ordinarily, trains are not delayed, accidents constitute the exception, not the rule, and generally two or a dozen trains may follow one another over such a space without collision, interference or the slightest danger to one another, if the crews perform their duties. For the exceptional cases, provision is made by certain duties imposed upon these servants. In case one train stops for any reason, it is the duty of the rear flagman to go back a sufficient distance to enable him to cause the following train to stop and thus avoid collision. If a train is delayed and a following train does not overtake it at the point of stoppage, means are provided for giving notice of the delay. One or more torpedoes are fastened to the track, and, exploding, indicate to the following train the rate of speed at which it should run, or a fusee is dropped from a moving train, which, burning for ten minutes, will halt a following train until it burns out. In case of any indication of danger ahead, no matter what its nature may be, it is the duty of the crew to stop the train and send a flagman forward to investigate. What are known as extra or wild trains are frequently sent out after regular or scheduled trains. They are required to make the best time they can, observing the schedules of the regular trains, these being known to them and it being their duty to observe them without any special instructions to do so. In such cases, extra precautions are exacted

of the crew. Prudence, caution and safety do not require notice
to be given to the crews of several trains, going in the same
direction on a single track, of their relative positions. Ex-
perience has shown that it is thus practicable, without endanger-
ing employes or passengers, to devolve upon the train crews,
under certain conditions, the management and control of the
trains, and that it is necessary to do so to avoid a useless waste
of time and economize in the interest of the railroad company
and the general public. Freeing the men, under such circum-
stances, from time and speed requirements, is in itself a rule or
measure conducive to safety, and, at the same time, permissive
of enlarged duty and responsibility on the part of the employes.
If an employe were not required to do anything but take care of
himself, no hardship would be inflicted upon him by the re-
quirement. If his duties are such as to allow him no opportunity
to take measures for his own protection, the employer must
provide for his safety by keeping others out of his way. As
limitations are imposed and freedom restrained, the means of
self-protection are diminished. As limitations are removed,
ability of the servant to protect himself is enlarged. Such rules
as have just been indicated have been judicially approved.
*Nolan's Admx.* v. *N. Y. N. H. & H. R. R. Co.,* 70 Conn. 159 (43
L. R. A. 305) ; *Enright* v. *Toledo, A. A. & N. M. Ry. Co.,* 93
Mich. 409; *Illinois C. R. R. Co.* v. *Neer,* 31 Ill. App. 126. In
*Nolan* v. *Railroad Co.,* the court declared as follows: "The
legal duty of a railroad company operating a single-track road
to its employes is not violated by failure to provide in its rules
for giving those in charge of trains moving in the same direc-
tion telegraphic information of the relative position of the trains.
A railroad company operating a single-track road is not negli-
gent in failing to give those in charge of trains moving in the
same direction telegraphic information of the relative position of
the trains." In the opinion, the court said: "The conditions
in general attending trains moving in the same direction under
the rules, without telegraphic information of their relative posi-
tion, includes: All trains, regular or extra, made up in all
ways, even to a single engine; trains off their regular time, way
freights being commonly behind time; stopping places for trains
which are used only occasionally and not at regular intervals;
trains moving at all times of day and night, and in all con-

ditions of weather and atmosphere; trains moving at various rates of relative speed. The special facts found from which, apparently, the inference of an exceptional case of emergency is drawn, are the following: Train 474 consisted of an engine pushing a snow plow. Train 1411 was upward of an hour behind its schedule time. Train 1411 stopped to attach three freight cars at Kent Furnace, which is merely a siding where freight trains stop occasionally and at regular intervals. The rear train, when in motion, moved at a faster rate of speed than the forward train. The day was very cold, and the snow plow threw snow considerably, rendering it difficult for the lookout stationed on the snow plow to see ahead. Just before the accident, the plow was not throwing much snow, and the lookout could see. We think the condition shown by these special facts, considered by themselves or in connection with all the special facts found, are within the conditions in general attending trains moving in the same direction; do not constitute an exceptional case of emergency unprovided for by the general rules; and did not throw upon the defendant or its train dispatcher the special duty of keeping the conductors of those trains informed by telegraph of their relative position. No other inference can be legally drawn from the facts." To the same general effect, see *Kennelty* v. *Railroad Co.,* 166 Pa. St. 60.

In view of these general principles, it becomes necessary to determine what the duty of the Terminal Railway Company was. As has been stated, it used the standard code of rules, as far as they were deemed applicable, but how far they were applicable the evidence does not clearly disclose. It indicates that the trains were not scheduled, nor susceptible of government and control by schedules. Before the Baltimore & Ohio trains were allowed to go over its tracks, all trains were permitted to enter the tunnel without orders, and all trains ran extra, and without limitation. It is also said that the effect of the orders afterwards given was not to change the character of the trains from extra to regular, but only partially to supersede the yard limit rules. This implies that, in the absence of such orders, all trains and engines operated under yard rules, and this imports that all such trains were required to be run at a low rate of speed and kept under control, so that train crews would be able to protect themselves at all times, if they were

diligent and careful in the performance of their duties. There is no .evidence tending to show that any train on the road was scheduled or that the two trains in collision were scheduled. No reason is perceived why a company operating a short road, having many connections by switches and used substantially for the purpose of switching and transferring cars from one railroad to another, and between railroads and points of consignment and delivery, may not, if it sees fit to do so, dispense with schedules and operate its engine and trains as they are operated within the yard limits of a large railroad system. If it operates no scheduled trains, the rules relating to such trains could have no application. If all its trains and engines are made subject to the rules governing operations within yard limits, it is clearly under no duty to prescribe or observe any rules other than those which experience has shown to be adequate and reasonable under such conditions. These rules require nothing of the train crews that render them unable to provide for their own safety. It is their duty to know when the track ahead of them is clear and not to proceed without knowing it to be so. They are under no time limit requiring them to maintain any particular rate of speed, and they are required to keep the trains under control so that they can be almost instantly stopped, when they are unable to see that control of them may be safely released. For instance, if, within the yard limits, the engineer perceives a clear track for some distance and knows, by reason of the switch connections, that nothing can obtrude itself so as to make a high rate of speed. dangerous, it is possible he may put on the steam, and, for the time being, let the engine get beyond control in the sense that it cannot be instantly stopped; but, if he does this without knowing it is safe to do so, he does it without necessity and not in obedience to any rule, but in violation of the rule and of his duty. Transportation under such limitations must necessarily be comparatively slow, but if the railroad company sees fit to operate its road in that manner, there is no limitation upon its power to do so, nor is it under any duty to provide or adopt any rules beyond such as are reasonably safe. It seems logically clear also that a railroad company so operating may modify the yard limit rules, by adoption and use of some orders applicable to schedule trains on main line roads, without wholly dispensing with yard limit rules or adopting

all the rules applicable to scheduled trains; and, if it does so, the adoption of such additional rules does not impose a duty, respecting them or trains operating under them, higher than, or different from, that which rests upon companies operating scheduled trains or extra trains under the same rules. In other words, if a railroad company may send one extra train after another on a single track, outside of the yard limits, without notifying each crew of the relation of its train to the other, it seems clear that the same thing may be done within the yard limits, without relieving the crews of the duties imposed upon them by the yard limit rules.

The employes of the Terminal Railway Company were supplied with books of rules and the testimony indicates that they were all familiar with them, not only those applicable to operations within the railroad yards, but the others as well. In the exercise of their daily duties, they observed such of them as were applicable. The conductor, engineer and brakemen all knew what was required of them by these rules. The track on which they worked was similar to other railroad tracks. While they operated through a tunnel, that fact did not relieve them from the duties imposed upon them by the rules, nor impose upon the company the duty to formulate rules for operations within the tunnel, different from those observed by other railroads running trains through tunnels; and it is not contended here that any special duty in respect to the tunnel was omitted. Something is said about a target sometimes used in it for the purpose of giving notice of the passing of trains, not to the train dispatcher, but to some other officer, but the purpose of this is not made clear. It could not have been intended for the purpose of enabling the train dispatcher to control trains within the tunnel, for there was no means by which he could communicate with them while in it. The whole tendency of the testimony is to the effect that all the trains, whether in or out of the tunnel, were completely within the control of their crews who were so far free from restrictions, as to time and speed, that they could protect themselves, and that the rules under which they were operating contemplated that they should do so. A thing peculiar to the tunnel was that, under certain atmospheric conditions, the smoke made by passing trains would remain in it for some time, while, under other conditions, it would clear out almost

immediately, and, when the tunnel was free from smoke, the view through it was unobstructed, so that trains might follow one another through it with practically as much safety as they could follow one another elsewhere on the track.   The light trains of the terminal company made comparatively little smoke, while the heavy ones of the Baltimore & Ohio Company made a great deal, enough to fill the tunnel full, so that nothing could be seen.   This, we must assume, was well known to those who were daily passing through the tunnel and had constant opportunities to observe it.

In view of all the circumstances and conditions, we are of the opinion that there was no failure of duty on the part of the railway company in respect to the adoption and promulgation of rules, nor on the part of the train dispatcher in giving the orders under which the trains were running.   These orders were taken from the forms prescribed by the rules and given in accordance with the rules.   Certain other orders could have been given which would have prevented the collision, and it is insisted that the train dispatcher failed in his duty by not giving them.   It is to be observed, however, that the company was under no duty to do more than make a reasonable provision for the safety of its employes, and that it could devolve upon them the duty to preserve themselves from danger, by relieving them of time and speed requirements so as to enable them to do so.   The reasons for this view have already been stated and there is no occasion to repeat them.

Some authority is cited for the position that a train dispatcher is not a fellow servant of the trainmen on a railroad; but it is unnecessary to inquire whether, by the weight of authority, or any decisions of this Court, the proposition is true, since there was no failure of duty on the part of the train dispatcher.

Our conclusion is that the injury was the result of negligence on the part of the men in charge of the trains, all of whom were fellow servants.   Those in charge of the terminal company's train were unquestionably so and the Baltimore & Ohio train was under the control of the pilot, a servant of the terminal company.   Its crew took their orders from him and the train, while under his control, was operated under the Terminal Railway Company's rules.   For the purposes of this case, therefore,

the Baltimore and Ohio Railroad Company's servants were the servants of the Terminal Railway Company, and the fellow servants of the crew of the other train. The presence of dense smoke in the tunnel was sufficient to put the crew of the following train on inquiry and deter them from proceeding without knowing the cause of it. By the exercise of diligence and care, they could have ascertained the danger, and it was their duty to do so.

Perceiving no error in the judgment complained of, we affirm it.

*Affirmed.*