# CHARLESTON.

## Culp, Adm'x. v. The Virginian Railway Co.

### Submitted March 13, 1917. Decided March 27, 1917.

1. Pleading—*Variance—Place of Injury.*

   An allegation of the place at which an injury is alleged to have been occasioned on a railroad, by the negligence of the railroad company, through its servants, laid under a videlicet, does not limit the proof to the exact spot so designated in the declaration, nor estop the plaintiff from proving a slightly different place as an evidential fact constituting an element in his theory of the negligence averred. (p. 105).

2. Master and Servant—*Action for Injury—Declaration—Place of Injury.*

   Like the time, the exact place of an injury by negligence on a railroad is so far immaterial that it need not be strictly proved, if alleged, wherefore the allegation thereof may and properly should be, laid under a videlicet. (p. 105).

3. Witnesses—*Impeaching Own Witness—Contradictory Evidence.*

   Though a party cannot impeach a witness called by him, he is not bound by everything such a witness may say. He may prove the material facts of his case by other evidence, even though in effect it directly contradicts such witness. (p. 107).

4. Master and Servant—*Action for Injury—Question for Jury—Negligence.*

   An issue as to negligence in the operation of railroad trains, dependent upon oral testimony as to relative positions and inconclusive inferences arising from admitted or established facts, properly falls within the province of the jury for determination. (p. 107).

5. Same—*Action for Injury—Question for Jury—Place of Injury.*

   Against the measured and proved distance from the point at which witnesses say a train stopped and the admitted length of the. train, put in evidence to prove the exact location of the rear thereof, at the time of a collision therewith by a following train, the oral testimony of witnesses to its location elsewhere, founded upon mere casual observation, aided by inferences arising from admitted positions in which the bodies of persons injured and killed by the collision were found thereafter, and the location of derailed and injured cars and debris, does not prevail to such an extent as to warrant withdrawal of the issue from the jury, by exclusion of the evidence and direction of a verdict. (p. 107).

6. SAME—*Action for Injury—Question for Jury—Obstructed Vision.*

An issue as to whether fog so far obstructed vision as to prevent the men in charge of the engine of a following train from seeing the markers on the rear of a preceding one, at a certain place, properly goes to the jury on proof of the facts that, within half an hour previous to the time in question, they had seen them for a distance greater than was necessary to afford time within which to stop the train, at another place less than four miles distant, and that railroad lanterns were visible at the place in question for a distance sufficient for the purpose aforesaid, a few minutes after the markers should have been seen and heeded to prevent a collision, and the admission of the engineer that he could have seen the lantern of the flagman, if he had been out. (p. 108).

7. SAME—*Injury to Servant—Negligence—Operation of Train.*

Failure of a preceding train to flag the following one, on stopping at or near a station, does not absolve the men in charge of the engine of the latter from duty to maintain a reasonable look out for the presence of the former on the track.   (p. 109).

8. SAME.

If, in such case, the enginemen of the following train are aware of the purpose of the preceding one to stop at or near a certain station, they are under duty to maintain a careful and vigilant look out for it, on approaching such station, and their failure to observe it, when visible, and stop their train or put it under control, is evidence of negligence, even though such information was derived only from the crew of the preceding train.   (p. 109).

9. SAME—*Action for Injuries—Operation of Trains—Rule.*

In the closing up of two or more trains at stations, the time limit of Rule 91 of the standard railway rules, does not apply, but relief therefrom necessarily imposes a limit of speed and a more rigid duty upon the train crews to take precautions for safety. Under such circumstances, few rules other than those requiring signals are applicable, and the safety of the trains and their crews depends upon the care and vigilence of the train men, which should be adequate for such exigencies as experienced and skillful men are deemed to be able to provide for.   (p. 109).

10. SAME—*Injury to Servant—Operation of Trains.*

Though ordinarily a closing up at a station may be an authorized one, there is a closing up in fact, which the train men must observe, when the crew of a following train is aware of the purpose of a preceding one to stop at or near a station or siding, however such information may have been obtained; and, if the pur-

pose of the contemplated stop is not made known, they must take into consideration the known purposes for which trains of the character of the one in question make stops.  (p. 110).

11. APPEAL AND ERROR—*Subsequent Writ of Error—Modification of Opinion.*

It is permissible to modify an opinion delivered on one writ of error, in passing upon a second one in the same case, if no injury or injustice will result from such modification.  (p. 111).

Error to Circuit Court, Mercer County.

Action by Abbie Culp, administratrix, against the Virginian Railway Company.  Judgment for defendant on a directed verdict, and plaintiff brings error.

*Reversed, verdict set aside, and case remanded for new trial.*

*Welborn & Jamison,* for plaintiff in error.

*McNutt, Ellett & McNutt, Brown, Jackson & Knight, Sanders & Crockett, A. G. Fox* and *G. A. Wingfield,* for defendant in error.

POFFENBARGER, JUDGE:

On the new trial of this case, awarded by the decision reported in 77 W. Va. 125, 87 S. E. 187, the trial court sustained the motion of the defendant to strike out the evidence and direct a verdict for it, and, on a verdict rendered in obedience to such direction, a judgment was entered, for review of which this writ of error was obtained.

Narration of the circumstances of the injury complained of is not necessary.  They are set forth in the opinion delivered on the former writ of error, and many of them will be found in the opinion delivered in *Hull* v. *Virginian Railway Co.,* 78 W. Va. 25, Hull having been killed in the same catastrophe in which Culp met his death.  On the second trial of this case, the evidence was enlarged in one particular.  The distance between the east end of the switch at which Culp's train stopped and the east end of the bridge it had partially crossed before stopping, was obtained by measurement and proved.  The exact length of the train itself was also ascertained and put in evidence.  The distance aforesaid was 932

feet and the length of the train 934 feet, lacking one-eighth of an inch, not including the slack which may have been as much as five feet, but cannot be accurately ascertained. The purpose of this new testimony was to overcome the effect of evidence tending to prove the caboose in which Culp was at the time of the rear end collision, was about the middle of the bridge and concealed by a bank or hill, and to prove that it was at the east end of the bridge and extended beyond that point, anywhere from two to seven feet and was, therefore, visible to the men in charge of the engine of train 500, by reason of the markers, red lights, on the rear, and a lantern hung in the center of the rear thereof, on the railing. To make these measurements material and effective, evidence as to the point at which the engine of train 455 stopped, adduced on the former trial as well as in this, was relied upon by the plaintiff. Engineer H. L. Spotts of that train repeatedly stated on his examination in chief, that he stopped his engine just in the clear of the switch at the east end of the passing tracks. He says he "wasn't right jam up against it," but that he aimed to stop as close to it as he could. On cross-examination, he repeated this, saying he stopped just clear of the east end switch. The purpose of the stop was to "run around" two cars, at the Hotchkiss siding which connected at each end with the main line, so as to put them in front of the engine, in order that it might push them on to a blind siding at Slab Fork, another station. "Running around" cars is effected by stopping the train at or near a switch of a pasing siding, one opening into the main line at each end, by a switch; disconnecting the cars to be put in front of the engine; pulling them up beyond the switch; disconnecting the engine from them there; running the engine, on the main line, to the other end of the siding; backing through the switch into the siding and along the siding on to the main line again; connecting with the train; pulling it up until the engine reaches the cars cut out; and attaching them in front of the engine. On such occasion, the head brakeman, C. H. Jones, in this instance, accompanies the engine; the middle brakeman, W. E. Davis, on this occasion, stations himself at the switch near which the train

is severed; and the rear brakeman, Hull, in this instance, goes back to protect the rear by flagging any train that may be following. When the train stopped at Hotchkiss, Jones was on the head end. He cut the two cars loose and was in a .position to know where the train stopped. He says it stopped "near about the switch." Reinterrogated as to this point, he repeated this and added "I can't say whether they stopped right on the switch or whether it stopped a little bit east of it. * * * It was somewhere near the switch. I wouldn't say just how close it was to the switch." The middle brakeman, W. E. Davis, who came up from the rear of the train, the caboose, and took a position at the east end of the switch, says the head of the train was standing back two or three cars from the switch. Morris, conductor of train 500, after the collision and some investigation as to the results thereof, passed the east end of the switch on his way to the telephone box, to notify the train dispatcher of what had happened. Interrogated as to how near the east end of the switch 455 was standing, he replied: "He was right near the east switch. He was a car length or two of the east switch, 150 feet, something like that." After having stated he made the trip on foot and possibly in a run, he was again interrogated, and said: "Well I don't remember how far it was, because I didn't pay any attention to that after the accident happened." If proof of the distance from the east end of the switch to the east end of the bridge and the length of the train, the existence of slack in it and the evidence as to the point at which the train stopped, are sufficient to warrant the jury in finding the rear end of the caboose was at or beyond the east end of the bridge, the markers and the lantern may have been visible to the men in charge of the engine of train 500. To prove they were, photographs of the track and bridge, taken from points on the track at distance of 444 feet east of a man standing at the west end of the bridge, 444 feet east of a man standing on the middle thereof and 444 feet east of a man standing at the east end thereof, were introduced, and each revealed the full stature of the man. Another taken from the track at a distance of 490 feet east of a man standing at the west end, disclosed

the man's head and shoulders. He is also dimly revealed in others taken at points 677 feet east of the middle of the bridge and 1147 feet east of the east end. At or just beyond the east end of the bridge, there is a curve toward the left, or the south going west, the direction in which the train was running. Nevertheless, photographs taken with a camera on the track, an elevation much less than that of the outlook of an engine, at a distance of 444 feet from the west end of the bridge, reveals the full stature of a man standing at the west end, wherefore the entire bridge must have been visible from the cab of an engine. The caboose of a freight train standing on the bridge, with the rear end fully lighted, and the lights much higher than a man's head, would necessarily be still more conspicuous and clearly visible, unless the view was obstructed by fog or otherwise. The embankment on the left could not have interferred with the view of the bridge from that distance. The engineer's position was in the right side of the cab, wherefore these lights may not have been visible to him. They were considerably to the left of his direct line of vision. The fireman at the time of the collision, was engaged with his fire, but the head brakeman occupied a seat in the left of the cab and a jury might very well infer his ability to see the lights in the absence of fog, if he kept a lookout. He admits he was not doing so at the instant of the collision. He says he was then engaged in moving a bucket with his feet, and was looking down at it. The existence of fog at the time of the collision is relied upon as having obstructed the view. To meet and repel the evidence of such obstruction, the plaintiff relies upon proof of the ability of the men on engine 500, while both trains were on the siding at Maben, to see these lights at a distance of a little less than 600 feet. Though a witness says the fog was denser at Hotchkiss than at Maben, the engineer of train 455 says he could see the lights the men had at the derail, when he was about twelve car lengths, or 519 feet, distant from them. Moreover, the engineer of train 500 says he certainly could have seen a flagman with a red lamp or any kind of lamp, if he had been out; and head brakeman Spotts who was in the cab, says he does not think they could have stopped in time to prevent the collision, if he had been look-

ing out at the time he was moving the bucket and could have seen the caboose. No witness makes any positive statement that the fog was dense enough to prevent vision of a light within the distance in which a stop could have been made, about 444 feet. Though they are positive as to the existence of fog and the engineer says it would have obstructed his view, not that he could not have seen a light through it, and the head brakeman says he could not see very far, they do not attempt to justify or excuse on the ground of fog alone. They combine their testimony as to it with that relating to the curve and embankment. Neither says positively or definitely whether it was the curve, the fog or the embankment that prevented them from seeing the markers.

There is some testimony tending to disprove the presence of the caboose of train 455 on the east end of the bridge or on the ground beyond it, east of it, in the direction of the oncoming train. Middle brakeman Davis who was in the caboose, when the train stopped, emerged therefrom at the front end and alighted on the bridge, even though the rear end may have been beyond the bridge and on the ground. To get to the west end of the bridge, he had to climb into a gondola car, traverse its length and proceed through and over one or more others in like manner, before he reached the ground at the west end. As to the number of cars he passed over, his statement is neither definite nor certain. He puts the number at two or three and adds that he ''don't remember exactly.'' Having stated the caboose was on the middle of the bridge, he was further interrogated on that point and said: ''Just as well as I could see. * * * As near as my knowledge, it was about the center. * * * I just looked out and seen it was on the bridge, and went on over the cars. * * * In my judgment I was about the center. * * * * No, sir; I never looked back.'' The engineer of train 500 says the caboose was standing somewhere on the bridge. On a reinterrogation, he said: ''About middleways of the bridge, possibly not quite half way over west.'' He does not say he ever saw the caboose before he struck it, nor does the brakeman who was in the cab with him. The latter evidently did not see it at all, for he says

he was looking at a bucket at the time. As to the position of the caboose, he says it was right on the curve, and the photographs show the curve to have been, or to have commenced, at or about the east end of the bridge. The position in which the bodies of Culp, the conductor, and Hull, the brakeman, were found, and the character, condition and position of the wreckage and debris, tend to prove the location of the caboose to have been about the middle of the bridge. Hull's body was found in the bed of the creek, four or five feet to the right of the bridge and about 111 feet from the east end thereof. Wreckage of the caboose, the iron frame, was carried to the west end of the bridge and Culp's body was found on the slope of the fill at or slightly beyond the west end thereof. Near the point at which Hull's body was found, there was a cushion and a wash basin from the caboose and some debris which a witness described as "sides of the cab." Between the points at which the two bodies were found, there were parts of the cab or caboose and one of the gondola cars. Four of the cars were derailed and injured. In describing them as he found them, conductor Morris says: "One over the right—two at the right side of the track and one at the left. One was turned off of the bridge and one headed over the embankment at the west end of the bridge and one turned to the—on the side, kind of crossways at the right hand side at the west end of the bridge." Four were reported as having been injured.

Alteration of the aspect of the case, by the introduction of the new evidence referred to, is resisted upon two technical grounds: (1), estoppel by the pleadings, allegations of the declaration as to the position of the train; and, (2), alleged inability of the plaintiff to contradict her own witnesses by inferences arising from the facts the new evidence tends to prove.

In the first and second counts of the declaration, it is alleged that, at the time of the collision, the rear of the train "Was, to-wit, ......... feet east of the easternmost switch of Hotchkiss on bridge No. to-wit 47." The second omits the phrase, "to-wit," before "47." The exact location of the caboose of the defendant's train, on the occasion of the col-

lision, was a mere evidential fact which it was not necessary
to plead at all.    Death of the plaintiff's decedent at any
point on the defendant's railroad, occasioned by its negli-
gence, would make it liable and give a right of action.
The rules of pleading require narration of such facts only
as are necessary to impose liability.    After having set forth
such a relation between the parties as confers a right or
imposes a duty, nothing additional need be alleged, except
invasion of the right or violation of the duty, and the result-
ant injury and damages.    *Bralley* v. *Railway Co.*, 66 W. Va.
462.    As in this instance, exactness of location is sometimes
material as matter of evidence, but even then it need not be
pleaded.    ''A declaration for tort arising from negligence
may allege mere negligence generally, without stating the
particular facts going to prove negligence, but must specify
with reasonable certainty the main or primary act of omis-
sion or commission doing the damage; and the allegation that
the defendant did the particular act causing the damage
furnishes the predicate or basis for evidence of all such in-
cidental facts and circumstances of omission and commission
as fairly tend to establish the negligence of the primary act,
and to plead them specifically would be to plead mere evi-
dence instead of facts.''    *Snyder* v. *Electrical Co.*, 43 W. Va.
661.    If the act complained of occurred at any point on the
defendant's railroad, it would warrant recovery.    The ex-
act location is immaterial.    The plaintiff would be under
no duty to plead the exact place any more than she would
be required to plead the exact time, unless the bridge was
the instrumentality that caused the injury.    It was not
material as matter of pleading or essential to the right of
recovery, that the negligent act took place on a bridge.    Real-
izing this and not desiring nor intending to be held down
to proof of the particular place named, the pleader very
properly laid the allegations of distance from the switch
and the location of the rear of the train, under a videlicet,
by the use of the phrase, ''to-wit.''    He thereby advised the
defendant of his intention not to be held to strict proof of
the location.    ''The office of the videlicet is to mark that
the party does not undertake to prove the precise circum-

stances alleged; and in such cases he is not required to prove them.'' Bouvier's Law Dict. Title, Videlicet; *French* v. *Canning Co.,* 168 Ill. 135; *Brown* v. *Berry,* 47 Ill. 175; *Pharr* v. *Bachelor,* 3 Ala. 237; 31 Cyc. 705. If, as a matter of pleading, the location was essential to right of recovery, the use of the videlicet would not dispense with proof thereof as alleged. 31 Cyc. 705. But, as we have said, it is not essential. Under the allegations as to place, a different place could be proved, just as time different from that alleged may be proved, when time is not material. If the videlicet is omitted, when its use would be proper, the omission would probably not make the fact alleged material as matter of pleading. *Culp* v. *Virginian Ry. Co.,* 87 S. E. 187; *Henley* v. *Railway Co.,* 59 W. Va. 419.

The other position is equally untenable. Although some of the plaintiff's witnesses say the caboose was at the middle of the bridge and state other facts tending to prove that location, she was not so far bound by their testimony, that she could not prove additional facts inconsistent with it and tending to make out her case on a different theory. ''Though a party cannot impeach a witness called by him, he is not bound by all such witness says. He may prove material facts by other evidence, even though the effect of it is to directly contradict his own witness.'' *Stout* v. *Sands,* 56 W. Va. 663; *Hickory* v. *United States,* 15 U. S. 303; Jones on Evidence, sec. 860; Best's Pr. Eviednce, sec. 645; Phillips Evidence, 3 Ed., 767.

If there was negligence on the part of the engine men of train 500, in not having observed the markers on the caboose of the preceding train, there is right of recovery, even though it be conceded that the decedent Culp was negligent in not having required his flagman to warn the approaching train. *Pennsylvania Railroad Co.* v. *Cole,* 214 Fed. Rep. 948; *New York, C. & St. L. Ry. Co.* v. *Cole,* 214 Fed. Rep. 952. Neither the contributory negligence of the injured servant nor the negligence of a fellow servant bars right of recovery under the Federal Employers' Liability Act. *Easter* v. *Virginian Railroad Co.,* 76 W. Va. 383, 86 S. E. 37.

Assuming Hull's presence in the caboose at the time it was

struck, it is the province of the jury to say how his body got out of it, with only broken bones and without mangling similar to that which characterized the body of Culp, and why it was dropped to the ground at a point 80 feet distant from that at which the body of Culp fell. It is the function of a jury also to say whether, assuming Hull to have been struck on the track and not in the caboose, it was possible for his body to be thrown or carried from the east end of the bridge, a distance of 111 feet to the point thereon immediately over the bed of the creek. And it is within its province to determine also, whether the wreckage or debris of the demolished caboose and cars was carried westward by the impact of the engine of train 500. All the court can do is to say the differences in location and condition of the bodies of the two men and the character, position and condition of the debris and wreckage tend to prove location of the caboose at the middle of the bridge at the time of the collision. On the other hand, it is bound to recognize and give effect to the probative tendency and character of the proof of the distance from the switch to the east end of the bridge and the total length of the train, as well as the evidence tending to prove the point at which the train stopped. It is beyond the power of the court, the jury or mortal man to know or describe all of the incidents of a collision. Many of them leave no impression on the ground, in the air or elsewhere. Only its results are capable of definite ascertainment. From them some necessary and conclusive inferences arise, but, on the other hand, most of them are merely evidential, probative, but not conclusive. Such is the character of those relied upon as conclusively showing the caboose must have been at the middle of the bridge. All the courts can do, under such circumstances, is to let the case go to the jury for its determination.

As has been observed, no witness was definite and certain in his statement that the caboose stood on the middle of the bridge, but, if this were clearly proved or admitted, photographs introduced in evidence show it was possible to see the lights on the rear of the caboose at any point on the bridge, even the extreme western end, unless something other

than the topography or contour, or both, interfered. The brakeman on train 500 was in a position from which they could have been seen, unless the fog was so dense as to conceal them. As to this issue, namely, whether the fog was of such density, facts already detailed indicate the negative. At Maben 3.7 miles distant, the lights were seen at a distance of over 500 feet. At Hotchkiss, the scene of the wreck, the railroad lanterns were seen for a distance of about 500 feet, a few minutes after the wreck. Another fact not hereinbefore adverted to, but proved on this trial as well as on the former, is that the head brakeman and the engineer on train 500 knew train 455 was to stop at Hotchkiss station or siding. The former admitted it and says the latter knew it. This information did not come to them under or by virtue of any rule of the company, nor from any official or superior source, so far as the evidence discloses, but the rules and official orders do not relieve from duty to observe information coming from other sources, pertaining to or affecting the safety of the trains and the lives of persons on them. They do not absolve a train crew from duty to take even simple precautions against danger, when the taking thereof does not preclude execution of the express orders given. On the contrary, Rule 717 enjoins the duty of extraordinary care in foggy, thick or stormy weather and the duty of inquiry as to dangers. Failure of one servant to give a required signal does not justify another in relying upon such failure. He must, nevertheless, avail himself of any means of safety at his command. *N. Y., O. & St. L. R. Co.* v. *Niebel,* 214 Fed. Rep. 952; *Penn R. Co.* v. *Cole,* 241 Fed. Rep. 948. Manifestly, therefore, whether the caboose was in a position to enable the engine men of the following train to see the markers on it, whether the weather conditions were such as to prevent their view of the lights, and whether, having been under duty to see the standing train and prevent injury thereto, they omitted that duty, are all questions for jury determination.

On the former trial, the effect of the knowledge of the purpose of train 455 to stop at Hotchkiss, on the part of the engineer and head brakeman of train 500, was not invoked by any instruction asked, nor in this court by any argument

or even a suggestion. In addition to its significance and weight upon the inquiry as to whether there was negligence arising otherwise than under Rule 91, the inquiry just disposed of, it has operation and effect under the exception found in that rule. On the former writ of error, application of the rule was invoked only on the ground of departure of train 500 from Maben in less than ten minutes after the departure of train 455 from the same place. It was urged then only that the time limit·of that rule, which has no application when trains are closing up at stations, had been violated, not that any other rule, custom, usage or duty incident to the operation known as "closing up," was violated. Neither, on the former trial nor this one, did anybody define "closing up" by the introduction of a rule or otherwise, or say what rule governs it. What it means may be inferred from the testimony of a witness who says the two trains were closing up, when they arrived at Maben and went on the same siding, but not when they were leaving it. There could be but one reason for dispensing with the time limit in closing up, namely, necessary reduction of speed and acquisition of complete control of the engine by men in charge of it. The proximity of the trains then makes dangerous the speed ordinarily maintained on a track known or presumed to be clear. It is a situation making safety depend upon the degree of care required by the exigencies that may arise. In other words, safety then depends upon the watchfulness and skill of the men in charge, in addition to observance of the particular rules applicable, such as those requiring signals. *Jackson* v. *Railway Co.,* 65 W. Va. 415.

Though there may have been no provision for an authorized closing up at Hotchkiss, within the meaning of the exception, the men in charge of the engine of train 500 knew there would be a closing up in point of fact at that place, if they knew train 455 was to stop there to run around cars, an operation requiring several minutes and necessarily leaving the train on the main track outside of the limits, during performance thereof. There is no proof that they knew what the stop was to be made for, but the contemplated operation was a common one on that road, and reasonable forethought

would have suggested it, as being at least a possible incident of the stop. There is evidence that both the engineer and the head brakeman knew the stop was contemplated, wherefore a jury would be authorized. to find that they knew it and that they had reason to believe there would be a closing up at Hotchkiss, demanding more than an ordinary look out for an obstructing train.

In so far as this phase of the case may be deemed to have been overlooked in the former opinion, the attorneys for the plaintiff in error must assume the larger share of the responsibility therefor. In failing to bring it to the attention of the court, they induced such error as there may be in any expression of the former opinion, pertaining to it.

As a new trial must be awarded on another ground, no injury will result from the foregoing qualification of the former opinion wherefore it is permissible. *Wiggins* v. *Marsh Lumber Co.* decided at this term; *Pennington* v. *Gillaspie,* 66 W. Va. 643.

The judgment will be reversed, the verdict set aside and the case remanded for a new trial.

*Reversed, verdict set aside, and case remanded for new trial.*