FORREST POE

*v.*

KEY FRANKLIN PITTMAN *et al.*

(No. 12385)

Submitted September 14, 1965.   Decided November 2, 1965.

*Hyer, Gibson & Talbott,* for appellee.

*Steptoe & Johnson, Kingsley R. Smith,* for appellants.

CALHOUN, JUDGE:

This case is before the Court on appeal from a final judgment of the Circuit Court of Randolph County entered on a jury verdict for the plaintiff, Forrest Poe, against Key Franklin Pittman and A. D. Pittman, defendants. The case arose from a collision of a 1961 model Volkswagen panel truck which was being driven by the plaintiff and a 1962 model International dump truck owned by the defendant, A. D. Pittman, and which was being operated by his son, defendant Key Pittman. The defendants have appealed from the action of the trial court in entering judgment against them on the jury verdict for $10,000 in favor of the plaintiff for personal injuries, medical and hospital expenses and loss of earnings sustained by him as a result of the collision of the two motor vehicles.

On this appeal the defendants rely upon five assignments of error as follows:   (1) The trial court erred in admitting testimony of Ronald Chenoweth concerning the speed of the Pittman truck and the "manner and method" of its operation prior to the occurrence of the collision and at a place approximately three miles distant from the place

where the collision occurred; (2) the plaintiff was guilty of contributory negligence as a matter of law; (3) the trial court erred in granting the plaintiff's instructions numbered one and four, respectively, as amended; (4) the verdict is contrary to the law and the evidence; and (5) the verdict is excessive.

The collision occurred in the City of Elkins at or near a point where Heavner Avenue joins North Randolph Street from the west side. Immediately before the collision occurred, the plaintiff was driving the Volkswagen panel truck northward toward Parsons on North Randolph Street, which is also U. S. Route 219. The Pittman truck approached the scene of the collision on U. S. Route 219 from the opposite direction; that is, the Pittman truck was proceeding from Parsons to Elkins.

The Volkswagen panel truck was of light construction, having its motor at the rear. It was equipped with snow tread tires on the rear wheels. The Pittman truck was equipped with ten wheels, weighed 16,400 pounds when empty, and was used for hauling coal. It appears without dispute that, at the time of the occurrence of the accident, U. S. Route 219 at the scene of the collision and throughout the entire distance between Parsons and Elkins, was covered by ice and snow so as to make driving conditions quite hazardous.

Immediately before the collision, the plaintiff was driving the Volkswagen down a portion of North Randolph Street known as Cut Hill, intending to turn to his left into Heavner Avenue.

The plaintiff testified that, because of the slippery condition of the highway, he was descending the hill at a speed of 15 to 20 miles an hour, applying his brakes lightly in order to maintain control of the vehicle; that he was using the next to the lowest of four forward gears; that when he first saw the Pittman truck, it was about a block beyond the bottom of the hill approaching a slight left turn in the highway at a high rate of speed on the plaintiff's right side of the center of the highway; that the Pittman truck

"began veering back and forth in the road;" that thereupon the plaintiff applied his brakes "a little harder", with the result that the Volkswagen started "sliding toward" the Pittman truck; that the Pittman truck proceeded to its right and struck a utility pole in or near Heavner Avenue at the place where it connects with North Randolph Street; that the Pittman truck came to rest with its rear portion across the center of the highway in such a position that it would have been impossible for the plaintiff to have passed in his truck; that the Volkswagen was out of control on the slippery highway when it slid into the Pittman truck; that the Pittman truck had been in a standing position four or five seconds before the collision occurred; that, as a result of the collision, the front bumper of the Pittman truck came against the clutch and brake pedals of the Volkswagen; that he, the plaintiff, was pinned in his vehicle for an hour after the collision before he was released by means of a jack; and that thereafter he was taken in an ambulance to Davis Memorial Hospital in Elkins for treatment of injuries he sustained in the collision. The general effect of the plaintiff's testimony is that the Pittman truck was coming toward him while partially on its left side of the road, later weaving back and forth in the highway; that the plaintiff applied his brakes with increased force in order to avoid a head-on collision of the two vehicles; and that, because of the increased force employed by him in the application of his brakes, the Volkswagen became unmanageable on the slippery highway and slid into the Pittman truck after it came to rest. The plaintiff's version of the collision is corroborated in various particulars by testimony of witnesses who appeared in his behalf.

Ronald Lee Chenoweth testified that he, his brother, his father and David Day had gone from Elkins to Parsons on the day in question to lay bricks in connection with the construction of a dwelling; that they were unable to work because of the inclement weather and that consequently all of them returned to Elkins; that they came to the scene of the accident immediately after it occurred; that during the course of the return, he was driving a 1953 model Ford automobile; that though he had chains on the rear wheels

of his automobile, he traveled at a speed of 35 to 40 miles an hour; and that the Pittman truck passed him about three miles from the scene of the accident. The witness was asked the following questions and gave the following answers: "Q. Did he go on out of sight then ahead of you? A. I hope to tell you he did. Q. About what speed do you think he was traveling when he passed you? A. I don't know that, but I tell you one thing he was flying." Counsel for the defendants objected to the testimony of the witness on the ground that it was "too remote." The Court ruled: "I will let it go to the jury for what it is worth." The witness testified further that when he arrived at the scene of the accident, the Pittman truck was crosswise in the road at an angle so that traffic could not pass around its rear end and that the Volkswagen was on the plaintiff's "side of the road."

John D. Chenoweth testified that he, driving a Dodge 1955 model ton truck, followed his son, Ronald Lee, from Parsons and that the Pittman truck passed him at a point 10 or 12 miles from the scene of the accident. He was asked to estimate the speed of the truck when it passed him. The court sustained an objection made in behalf of the defendants and did not permit the witness to answer the question. The witness testified that, when he arrived at the scene of the accident, the rear of the Pittman truck was extended across the highway at an angle so that there was no room for vehicular traffic to pass around it; that he proceeded toward his home by way of Heavner Avenue; and that the Volkswagen was near the curb on the east side of the road, which would have been the right side for a vehicle traveling from Elkins toward Parsons.

Donald Chenoweth testified that he was the son of John D. Chenoweth; that he rode in the automobile driven by his brother during the return trip from Parsons; that the condition of the road was bad and that tire chains were used on the automobile during the trip from Parsons to Elkins; that, when he arrived at the scene of the accident, the Pittman truck was standing at an angle so that its rear end extended three or four feet across the center of the

highway in such a manner as to block traffic traveling toward Parsons; and that the Volkswagen was standing near the center but on its proper side of the highway.

David Day testified that he was riding in the automobile driven by Ronald Chenoweth during the return trip from Parsons and that, when he arrived at the scene of the accident, the Pittman truck was standing at an angle across the center of the highway a distance of 3, 4 or 5 feet.

Earl Sines testified that he was principal of Parsons High School; that he started to Parsons from his home at Elkins on the morning of the accident but turned around and returned to Elkins because of the slippery condition of the highway; that when he returned to the scene of the accident, the Pittman truck was standing at an angle across the highway so as to block traffic; that, because he was unable to pass in the rear of the Pittman truck, he returned to his home by way of Heavner Avenue; and that the Volkswagen was standing between the rear of the Pittman truck and the curb on the east side, or the plaintiff's proper side of the highway.

G. C. Moran testified that he lived on North Randolph Street about 2½ or 3 blocks from the place where that street is joined by Heavner Avenue; and that, when he came on foot to the scene of the accident, the Pittman truck was standing at an angle in the highway with its rear end extending across the center of the highway 2 to 4 feet so that "it had the traffic stopped."

Lawrence William Arbogast testified that he is a part-time Pentecostal minister; that, on the day in question, he lived about a city block from the scene of the collision; that about eight o'clock in the morning of that day, he checked the condition of the highway and found that it was "very hazardous"; that he heard the Pittman truck approaching; that it sounded as though it was going at a great rate of speed; that he looked out a window of his home to see whether the truck "would be able to make the curve at the bottom of what they call Cut Hill, and when I looked out he passed my house at about 45 to 50 miles

an hour"; that he continued to watch the truck until it became involved in the collision; that, before it reached Heavner Avenue, the truck started "to slide from one side of the street to the other"; that the truck struck the utility pole, came to a stop and that, three or four seconds later, the Volkswagen collided with the Pittman truck; that the Pittman truck came to rest with its rear end "two-thirds of the way over on the other man's lane"; and that the Volkswagen came to rest with about 12 to 18 inches of its front end across the center of the highway and the remainder of it in the east lane, the proper lane of traffic moving toward Parsons.

Testimony by and in behalf of the plaintiff concerning the cause of the collision is contradicted by defense testimony, and particularly by the testimony of defendant Key Franklin Pittman. On the morning of December 21, 1962, apparently he had taken a load of coal for his father from Norton, near Elkins, to Parsons and was returning with his father's empty truck when the accident occurred. He testified that as he proceeded from Parsons toward Elkins, he traveled at a speed of approximately 25 miles an hour; that the highway was very icy and slick; that his truck did not skid or slide as he approached the scene of the accident; that he first saw the Volkswagen when he, in his dump truck, was approximately 100 feet from Heavner Avenue, traveling on his proper side of the highway; and that the Volkswagen was approaching at a speed of about 25 miles an hour. The witness made the following statement concerning the manner in which the accident occurred: "Mr. Poe's vehicle started sliding straight, just coming in a straight line toward Heavner Avenue. I pulled my vehicle off to the right in order to try to miss him and he just slid right into—I hit the telephone pole and approximately three seconds after that he slid into the left front of my truck and damaged it extensively." He testified further that his truck was approximately 25 feet long; that the utility pole was approximately 14 feet from North Randolph Street on Heavner Avenue; that the right fender and right front bumper of his truck struck the pole; that the left front portion of the Volkswagen struck the left front fender

and the left front bumper of the dump truck; that his dump truck was completely on its proper side of the center of the highway when it came to rest; that when the Volkswagen came to rest, one-half or more of it was on its left or the west side of the center of the highway; that, immediately before the collision of the vehicles, the Volkswagen was traveling at approximately 20 or 25 miles an hour; and that neither vehicle had been moved following the collision, when Elkins police officers came to the scene. On cross-examination the witness testified that during his return from Parsons, he traveled about 35 or 40 miles an hour; that he did not recall having passed any other vehicles during the course of his return from Parsons; and that the maximum lawful rate of speed for his truck on that highway was 40 miles an hour. From the testimony, it is evident that quite extensive damage was caused to the front end of the dump truck and to its very sturdy metal bumper as a consequence of the collision with the utility pole and the Volkswagen.

Gladys Rosencrance, a witness for the defendants, testified that she lived on North Randolph Street near the scene of the accident; that she heard the sound of the collision when she was in the kitchen of her home; that she promptly went to her front porch and saw the dump truck "over next to the pole" and that the front of the Volkswagen "was under the back of" the dump truck; that she did not go out to the highway but that, at the plaintiff's request, she went back into her home and called an ambulance; and that the Volkswagen, when it came to rest, was headed toward Heavner Avenue with its rear portion beyond the center of the highway on the opposite or east side.

Grace Phillips testified that she lived on Heavner Avenue about 180 feet from North Randolph Street; that, immediately before the collision, she was in her home looking out a front window while waiting for her husband to take her to her place of employment as a waitress in Elkins; that she saw the accident occur; that she saw the Pittman dump truck approach the scene on its proper side of the highway at "about a normal speed with relation to the rest of the

traffic that had been going by"; that as the Volkswagen proceeded down the hill, it was nearing the middle of the road and "cutting in" toward Heavner Avenue; that her means of vision was such that she could not see the Volkswagen or its position in the highway at the time of its collision with the dump truck; that the dump truck was stopped at the time it was struck by the Volkswagen; that she had no idea of the speed of the Volkswagen but that the collision caused the rear of the dump truck to "slide around just a little bit" toward the center of North Randolph Street; and that she could see the dump truck only for a distance of between 40 or 50 feet before it struck the utility pole.

Captain J. R. Stalnaker, an Elkins city police officer, testified that he went alone to the scene of the accident; that the dump truck was standing with about 12 feet of its front extending southward past the utility pole; that the rear of the dump truck extended back from the utility pole approximately 13 feet; that he was not able to determine the center of North Randolph Street because it was covered by snow and ice but that it appeared to him that the dump truck extended into the west traffic lane a distance of 4 or 5 feet; that no portion of the dump truck was in the east lane; that the Volkswagen was standing with its front end about even with the rear end of the dump truck; that the left side of the Volkswagen was close to the center of the highway; that traffic was blocked when he arrived at the scene; that there was a space of "a little better than 5 feet" between the two vehicles after they came to rest; and that, according to a sketch or diagram which was introduced in evidence and which he made while at the scene, the Volkswagen was standing in the vicinity of the curb on the east side of the highway. Actual measurements were made by the witness by means of a steel tape but not until May 19, 1964, while the trial was in progress.

By instructions granted, the trial court submitted the case to the jury on issues of the defendants' primary negligence; sudden emergency as that issue related to the plaintiff's actions preceding the collision; and contributory

negligence. In a written opinion made a part of the record, the trial judge reiterated his belief that the issues thus submitted were factual issues proper for determination by the jury. At the conclusion of all the testimony, the jury was permitted to take a view of the premises.

This Court has repeatedly held that where the evidence is conflicting, turning on the credibility of witnesses, or where the evidence, though undisputed, is such that reasonable men may properly draw different conclusions from it, questions of primary negligence, due care, proximate cause and contributory negligence are proper questions for jury determination. *Lewis* v. *McIntire,* 150 W. Va. 117, pt. 1 syl., 144 S. E. 2d 319, (decided October 12, 1965; *Kendall* v. *Allen et al.,* 148 W. Va. 666, pt. 5 syl., 137 S. E. 2d 250; *Hatten, Admr.* v. *Mason Realty Company et al.,* 148 W. Va. 380, pt. 5 syl., 135 S. E. 2d 236; *Dunning* v. *Barlow & Wisler, Inc.,* 148 W. Va. 206, pt. 2 syl., 133 S. E. 2d 784; *Evans* v. *Farmer et al.,* 148 W. Va. 142, pt. 2 syl., 133 S. E. 2d 710; *Metro* v. *Smith,* 146 W. Va. 983, pt. 1 syl., 124 S. E. 2d 460; *Leftwich* v. *Wesco Corporation et al.,* 146 W. Va. 196, pt. 7 syl., 119 S. E. 2d 401. A party may not rely on the sudden emergency doctrine if the situation he alleges to have been a sudden emergency was created, in whole or in part, by his own negligence. *Henthorn* v. *Long,* 146 W. Va. 636, pt. 1 syl., 122 S. E. 2d 186; *Crum* v. *Ward et al.,* 146 W. Va. 421, pt. 10 syl., 122 S. E. 2d 18. Where, however, in a case tried by a jury, the evidence relating to the question of sudden emergency is conflicting or where such evidence, though undisputed, is such that different inferences may properly be drawn therefrom by reasonable men, it is for the jury to determine whether the party relying on the sudden emergency doctrine was confronted with a sudden emergency; the nature and extent of the emergency; whether the emergency was created by him, in whole or in part; and whether he, in the emergency, conducted himself as a reasonably prudent person would have conducted himself in the same or like circumstances. *Evans* v. *Farmer,* 148 W. Va. 142, pt. 6 syl., 133 S. E. 2d 710; *Reilley* v. *Byard,* 146 W. Va. 292, pt. 3 syl., 119 S. E. 2d 650.

It is the peculiar and exclusive province of the jury to weigh the evidence and to resolve questions of fact when the testimony of witnesses is conflicting. *Evans* v. *Farmer,* 148 W. Va. 142, pt. 1 syl., 133 S. E. 2d 710; *Graham* v. *Crist,* 146 W. Va. 156, pt. 2 syl., 118 S. E. 2d 640; *Overton* v. *Fields,* 145 W. Va. 797, pt. 2 syl., 117 S. E. 2d 598. A jury verdict based on conflicting testimony, involving the credibility of witnesses and approved by the trial court, will not be set aside by this Court on the ground that it is contrary to the evidence unless in that respect it is clearly wrong or without sufficient evidence to support it. *Levine* v. *Headlee,* 148 W. Va. 323, pt. 1 syl., 134 S. E. 2d 892. In determining whether a jury verdict is supported by the evidence, every reasonable and legitimate inference, fairly arising from the evidence in favor of the party for whom the verdict was returned, must be considered, and all facts which the jury might properly have found in support of its verdict must be assumed as true. *Levine* v. *Headlee et al.,* 148 W. Va. 323, 329, 134 S. E. 2d 892, 896; *Walker* v. *Monongahela Power Co. et al.,* 147 W. Va. 825, pt. 3 syl., 131 S. E. 2d 736.

Tested by the well settled legal principles stated above, we are of the opinion that questions pertaining to the proper application of the doctrine of sudden emergency and the issues of primary negligence on the part of the defendants and contributory negligence on the part of the plaintiff were properly submitted to the jury; and we cannot say that the verdict of the jury in relation to such factual issues is clearly wrong or lacking in evidence for its support.

Counsel for the defendants, in his brief and oral argument, has attached peculiar significance to the nature and extent of the damage caused to the two vehicles by the collision. Admittedly this is a circumstance tending to show the force of the impact and the speed of the Volkswagen. *Butler* v. *Smith's Transfer Corporation,* 147 W. Va. 402, 128 S. E. 2d 32. We bear in mind, however, that it is undisputed that the Volkswagen, immediately before its collision with the dump truck, was descending a steep incline on a very slippery highway which sloped downward slightly toward

the west side; that the Volkswagen was out of control for some time and distance before it struck the Pittman truck and that the Pittman truck had previously been damaged by having struck a utility pole with considerable violence. The jury heard the testimony and took a view of the premises. Doubtless the violence of the collision of the two vehicles was argued forcefully to the jury. After having heard the testimony, instructions of the court and argument of counsel, and after having viewed the premises, the jury returned the verdict for the plaintiff and it has been approved by the trial court. In such a situation, we cannot say that the mere circumstances tending to show the force of the impact can be regarded as sufficient to override positive testimony adduced by and in behalf of the plaintiff and to form a basis for an adjudication that he was guilty of contributory negligence as a matter of law.

We are of the opinion that the trial court did not err in refusing to set aside the verdict and to grant the defendants a new trial on the ground that the amount of the verdict is excessive. The plaintiff sustained a laceration above his left eye which required suturing, a compound, comminuted fracture of his right arm near the wrist and a compound, comminuted fracture of his left leg near the ankle. These injuries required surgery and hospitalization for a period of sixty-two days. The plaintiff was required to wear a cast on his leg for four and one-half months and a cast on his arm for seven weeks. The cast on the leg extended from the foot to the hip. The cast on the arm extended to the elbow. The testimony establishes that the plaintiff worked as a lineman before the accident and that likely he will never hereafter be able to climb utility poles in connection with his employment. One of the attending physicians testified that the plaintiff has "some permanent partial disability", including some difficulty in movement of the wrist. The plaintiff testified that he has a large lump on his wrist as a consequence of the fracture; that the wrist is not strong; and that it swells and is painful at the end of a day's work. It was necessary for him to use crutches when discharged from the hospital and until July, 1963, which was more than six months after the injuries were

sustained. He was unable to return to work until September 1, 1963. At the time of the accident, the plaintiff's earnings from his employment were $325 a month. Testimony indicates that he suffered loss of earnings amounting to approximately $2600. When plaintiff's instruction number 2 was offered, counsel for the defendants objected to a portion of the instruction which would have authorized a consideration of loss of future earnings and that element was deleted from the instruction; but, without objection, the instruction authorized the jury to consider evidence of previous loss of earnings. He incurred hospital bills totaling $1102.80 and a doctor bill of $148.50. It appears, therefore, that the actual damages were approximately $3851.30. Apparently this means that the balance of the verdict, amounting to approximately $6100, represented an award of damages for pain and suffering, and for such permanent injuries as the jury may have determined to have been properly established by the evidence.

In an action in which the compensation which the plaintiff is entitled to recover is indeterminate in character, the verdict of the jury may not be set aside as excessive unless in that respect it is not supported by evidence or is so large that the amount thereof indicates that the jury was influenced by passion, partiality, prejudice or corruption, or entertained a mistaken view of the case. *Earl T. Browder, Inc.* v. *County Court of Webster County,* 145 W. Va. 696, pt. 4 syl., 116 S. E. 2d 867. "The law furnishes no measure of damages for pain and suffering. In such case, the decision of the jury upon the amount is generally conclusive, unless it is so large or small as to induce the belief that the jury was influenced by passion, partiality, corruption, or prejudice, or misled by some mistaken view of the case." *Collins* v. *Skaggs,* 110 W. Va. 518, syl., 159 S. E. 515. To the same effect see *Richmond* v. *Campbell,* 148 W. Va. 595, pt. 2 syl., 136 S. E. 2d 877; *Flanagan* v. *Mott,* 145 W. Va. 220, pt. 2 syl., 114 S. E. 2d 331; *Yuncke* v. *Welker,* 128 W. Va. 299, pts. 3 and 4 syl., 36 S. E. 2d 410; *Webb* v. *Chesapeake & Ohio Railway Co.,* 105 W. Va. 555, pt. 3 syl., 144 S. E. 100; *Bowling* v. *Guyan Lumber Co.,* 105 W. Va. 309, pt. 1 syl., 143 S. E. 86; *Looney* v. *Norfolk & Western Rail-*

*way Co.,* 102 W. Va. 40, 55, 135 S. E. 262, 268; *Gibbard* v. *Evans,* 87 W. Va. 650, pt. 4 syl., 106 S. E. 37; *Holt* v. *Otis Elevator Co.,* 78 W. Va. 785, pt. 5 syl., 90 S. E. 333; *Corrick* v. *Western Maryland Railway Co.,* 79 W. Va. 592, pt. 2 syl., 91 S. E. 458; *Trice* v. *Chesapeake & Ohio Railway Co.,* 40 W. Va. 271, pt. 3 syl., 21 S. E. 1022. In the light of the facts of the case and the applicable legal principles, we are of the opinion that we would not be warranted in disturbing the verdict of the jury on the ground of excessiveness.

Turning now to the assignment of error arising from the action of the trial court in admitting, "for what it is worth", testimony concerning the speed of the Pittman truck approximately three miles northward from the scene of the accident, we note that the trial court refused to permit another witness for the plaintiff to testify concerning the speed of the truck at a point approximately ten miles from the scene of the accident. It appears, therefore, that, considering remoteness in time and distance, the trial court was undertaking to exercise a sound discretion in the admission and exclusion of testimony of that character. It appears also that, in admitting evidence of the speed of the truck at a point approximately three miles from the scene, the trial judge indicated his view that the weight of such evidence, considered in relation to its remoteness, should be left to the jury for determination. We are of the opinion that the trial court did not commit error in this respect.

"Questions of the admissibility of evidence of the speed of an automobile at a particular time, as bearing upon its speed at another time, though on the same journey, rests largely in the discretion of the trial court." The Law of Automobiles (Virginia and West Virginia), Volume III (3d Ed.), Section 250, page 1194. To the same effect, see 61 C. J. S., Motor Vehicles, Section 516r, page 268; 8 Am. Jur. 2d, Automobiles and Highway Traffic, Section 951, page 497. "When the question is one of the remoteness of offered evidence, the decision is necessarily largely within the trial court's discretion, although this discretion is not unbounded, but must be governed by sound legal principles. However, in Virginia and West Virginia, so

jealously is the jury's province guarded by the careful separation of the functions of the judge and jury that, if the evidence tends even slightly to prove a fact from which a fact in issue may be inferred, it will generally be admitted, the weight to be given to it being left to the jury." The Law of Evidence (Virginia and West Virginia), Section 75, page 125. To the same effect, see Wigmore on Evidence, Volume II (3d Ed.), Section 382, pages 322-24. This Court has indicated that if evidence of this character tends in an appreciable degree to sustain the contention at issue, it is admissible; and that the safer and more satisfactory rule is to admit whatever is relevant, and to leave the question of weight to the jury for determination. *Wilson* v. *Fleming,* 89 W. Va. 553, 561-62, 109 S. E. 810, 814. See also *Ambrose* v. *Young,* 100 W. Va. 452, pt. 4 syl., 130 S. E. 810. In connection with an exhaustive annotation of the question here under consideration, the following summarization appears in 46 A. L. R. 2d at page 35: "The question whether testimony as to the speed of a vehicle at some point before it reached the scene of an accident shall be admitted or excluded on the ground of remoteness rests largely in the discretion of the trial court." The following statement appears at page 60 of the same volume: "Where there is independent evidence concerning the speed of a vehicle at the scene of the accident, the court may admit testimony concerning the speed of the vehicle at various points before it reached the scene of the accident to corroborate the evidence of speed at the scene." In *Wilson* v. *Fleming,* 89 W. Va. 553, 562, 109 S. E. 810, 814, the Court stated that, inasmuch as there was evidence that the automobile was being driven very rapidly immediately before the collision, the relevancy of the testimony concerning its previous speed at another place on the highway became "more apparent." Counsel for the defendants quotes and relies upon the fourth point of the syllabus of the same case which is as follows: "Evidence of former and remote negligent acts is incompetent to prove whether a person did or did not do the same or similar act of negligence on another particular occasion." A reference to the opinion discloses that the language quoted referred to evidence offered to show

a driver's reputation as a reckless driver. That portion of the opinion, therefore, is not applicable to the present case. In connection with the annotation in 46 A. L. R. 2d, the following appears at page 19: "In the majority of the cases the most important factor affecting the admissibility of evidence concerning a driver's conduct before reaching the scene of the accident is the degree of probability that the conduct continued until the accident occurred." In holding that the trial court did not abuse its discretion and did not err in admitting the evidence here in question, we bear in mind the testimony of witnesses that they followed the Pittman truck, from the point approximately three miles distant, to the scene of the accident and also the independent evidence of the speed of the truck immediately before the accident occurred.

It is urged in behalf of the defendants that the trial court erred in granting the plaintiff's instructions numbered one and four, respectively. "In a civil action no party may assign as error the giving of an instruction unless he objects thereto before the arguments to the jury are begun, stating distinctly the matter to which he objects and the grounds of his objection." *Nesbitt* v. *Flaccus et al.,* 149 W. Va. 65, pt. 4 syl., 138 S. E. 2d 859. See also R. C. P. 51; *Graham* v. *Wriston,* 146 W. Va. 484, pt. 4 syl., 120 S. E. 2d 713. When plaintiff's instruction number one was offered, various objections to it were made in behalf of the defendants, various amendments of the instruction were made in response to the objections, and the instruction was given by the trial court in its amended form. When the amended instruction was offered, counsel merely stated: "My remaining objections to the instruction still stand." It may be questionable whether in these circumstances counsel for the defendants stated "distinctly" the matter or matters to which he objected and "the specific grounds of his objection." Plaintiff's instruction number four was based on the statute (Code, 1931, 17C-6-1, as amended,) which provides, in effect, that no person shall drive a vehicle on the highway at a speed that is greater than is reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing. An amend-

ment of the proposed instruction was made in an effort, at least in part, to cope with the objections made to it. When the instruction in its amended form was offered, counsel for the defendants stated: "My objections to the instruction still stand"; that is, no objection was made to the change wrought by the amendment. We do not mean to disapprove this method of objecting to an amended instruction; but we do say that it has been difficult in this particular case to ferret out and determine what objections were or were not cured by amendment, and to determine whether objections to the instructions urged on this appeal were distinctly made in the trial court before the instructions were given. Nevertheless, we have carefully considered the objections made to the two instructions and are of the opinion that no prejudicial error was committed in the giving of either of them.

For reasons stated in this opinion, the judgment of the Circuit Court of Randolph County is affirmed.

*Affirmed.*