CARLOS E. LILLY, JR.

*v.*

PAUL D. TAYLOR

(No. 12619)

Submitted May 10, 1967.  Decided June 27, 1967.

*William Sanders, Mason M. Sproul,* for appellant.

*Bowers, File, Hodson & Payne, W. H. File, Jr. Edward M. Payne, III,* for appellee.

CALHOUN, PRESIDENT:

This case, on appeal from a final judgment of the Circuit Court of Raleigh County, involves a civil action in which Carlos E. Lilly, Jr., seeks recovery of damages from Paul D. Taylor for Lilly's personal injuries and for damage to his automobile arising from an automobile collision which occurred on a public highway in Raleigh County on June 22, 1965. Lilly, the plaintiff, was the owner and driver of one of the automobiles involved in the collision. Taylor, the defendant, was the owner, driver and sole occupant of the other automobile. The plaintiff prosecutes this appeal from a final judgment rendered on a jury verdict in favor of the defendant.

The primary or basic questions presented for decision involve the sufficiency of the proof to support the verdict and to warrant the action of the trial court in granting certain instructions in behalf of the defendant, and particularly instructions dealing with contributory negligence and the sudden emergency doctrine.

The accident occurred at approximately four o'clock in the afternoon on a road known as Secondary Route 1 or Maple Fork Road. At the scene of the collision the asphalt paving on the highway was sixteen feet, nine inches wide. The weather at the time was clear and the road was dry.

The state trooper who arrived at the scene shortly after the collision occurred and before the vehicles were moved testified that the highway at the scene was marked by a "center line" but the plaintiff testified to the contrary. It is undisputed, however, that the two vehicles collied head-on wholly within the plaintiff's traffic lane or portion of the highway. The state trooper testified that the left rear wheel of the defendant's vehicle came to rest partially on the berm on its left side, the plaintiff's side, of the highway; that the right front wheel of the defendant's vehicle was ten feet, seven inches from the edge of the pavement on the opposite side; and that this right front wheel was the part of the defendant's vehicle nearest to its own right edge of the pavement. The trooper testified further that the right front wheel of the plaintiff's vehicle was one foot, ten inches and the rear wheel was two feet, six inches from the edge of the pavement on its right side. The unpaved berm on that side was level and approximately two feet, six inches wide.

The road at the scene of the collision was level and comparatively straight, but some distance from that point in each direction there was a slight curve. The plaintiff in his automobile proceeded over a slight rise and out of a slight depression or "dip" in the highway as he came in sight of the defendant's approaching vehicle. The scene of the collision was described by the state trooper as being on a "very small knoll".

A photographer, who was on the scene shortly after the collision occurred and before the vehicles were moved, took excellent photographs of the vehicles immediately following the collision. These photographs were introduced in evidence and are a part of the record before this Court. They disclose clearly that the plaintiff's automobile came to rest in a position near and almost parallel to the edge of the pavement on its proper side of the highway; and that the defendant's vehicle came to rest in a diagonal position with its

left rear wheel off the hard surface and on the berm on its left side of the highway and with its front end extending in the general direction of the center of the highway.

The plaintiff's vehicle left skid marks extending back eighty-four feet from the point where it came to rest. These skid marks, for their entire length, were near and substantially parallel to the edge of the pavement on the plaintiff's side of the highway.

The state trooper testified that there were other fresh skid marks which extended from the defendant's side of the highway diagonally across to plaintiff's side of the pavement. These skid marks are clearly visible on the photographs. They extended in the general direction of the defendant's vehicle at the place where it came to rest after the collision. The trooper testified, and the photographs disclose, that these skid marks did not lead directly to the rear wheels of the defendant's automobile. In that connection, the trooper testified: "* * * I couldn't testify that they were made by the Taylor vehicle although I am reasonably sure they were, but I can't testify to that effect."

The defendant does not deny that his vehicle proceeded from its proper side of the highway diagonally across the pavement and that it became involved in the head-on collision with the plaintiff's vehicle on the latter's proper side of the highway. The defense at the trial was predicated upon contributory negligence and the sudden emergency doctrine. On the issue of contributory negligence, the court gave Defendant's Instruction No. Z which submitted to the jury the question whether, prior to the collision, the plaintiff was operating his automobile "at a greater rate of speed than was reasonable and prudent under the conditions then and there existing. * * *" In giving Defendant's Instruction No. AA, the court submitted to the jury the question whether the plaintiff was guilty of contributory negligency in not operating

"his vehicle at an appropriately reduced speed when approaching a hillcrest and when driving upon a winding roadway."

By Defendant's Instruction No. O, the court submitted to the jury the question whether "the defendant was suddenly confronted with an emergency" which was not caused in whole or in part by his own negligence. This instruction is, in the main, predicated on the defendant's testimony that two young female pedestrians were walking toward him on or near the edge of the pavement on his right side thereof as he approached the point of the subsequent collision. In support of the propriety of giving the sudden emergency instruction when it was offered, counsel for the defendant stated: " * * * I think it is a question for the Jury as to whether or not this [the presence of the pedestrians] created an emergency, the fact that he had to get out past the center of the road, and this instruction does leave to the Jury squarely the question of whether or not there was an emergency suddenly confronting the defendant, and the emergency was the combined position of his car and the sudden emergence of the Plaintiff's car at what we contend to have been an excessive rate of speed. * * * . I think it is undisputed that he put on his brakes and skidded across the highway." We are authorized to look to the trial court's written opinion, which was made a part of the record, to determine the basis of its action in granting the instruction. *Sargent v. Malcomb,* 150 W. Va. 393, 394, 146 S. E. 2d 561, 563. In the opinion the trial court stated: "* * * Under the circumstances here, Defendant contends that the emergency was the presence of the girls on or in close proximity to his portion of a comparatively narrow highway, requiring some action on his part to avoid danger to them. It is apparent that he neither caused nor contributed to their presence there. * * *." In their brief before this Court, counsel for the defendant state: "* * * the defendant faced a sudden emergency in the presence of

two girls on or in close proximity to his portion of a narrow highway immediately prior to the collision. * * * ."

We have undertaken to make a fair statement of the defense contentions in support of the action of the court in submitting the contributory negligence and sudden emergency issues to the jury. Inasmuch as it is undisputed that the head-on collision occurred wholly on the plaintiff's proper side of the center of the pavement, it seems obvious that, if the verdict and judgment for the defendant can be sustained, it must be on the basis of either or both of these defenses. We will proceed, therefore, to review the evidence bearing on the question whether the giving of the defense instructions on contributory negligence and sudden emergency was warranted by the evidence.

The defendant testified that, as he approached the scene of the collision, he rounded a slight curve in the highway; that he was proceeding at a rate of about thirty-five miles an hour; and that, after rounding the slight curve and reaching the comparatively straight and level area on which the collision occurred, he saw the two pedestrians who were facing him on or near his right side of the pavement. When asked whether they were walking on the pavement or on the shoulder, he replied that he "couldn't tell exactly" but he thought that "one of them was on the side of the road." He added: "She stepped off." He testified further that as he approached the pedestrians, he "swung out to give them room" and thereupon saw the plaintiff's automobile "coming at a fast rate of speed. Just seemed to burst out of nowhere." He testified that he "hit" his brake; that the plaintiff "put on his brakes, and was sliding;" that to the best of his "knowledge and ability to judge speed," he would say that the plaintiff's automobile was proceeding at a rate of fifty miles an hour as it came in view; that, after the collision, he got out of his car; and that, in the course of the exchange of a "few

words," he told the plaintiff that he "didn't see him." He denied having stated to the plaintiff that he (the defendant) must have been asleep. When asked whether he actually did see the plaintiff, he replied: "I did not see him." On cross-examination in reference to the two pedestrians, he stated: "It was my impression that one of them was on the edge of the road when I first saw them." When asked on cross-examination whether, after passing the pedestrians, he made any effort whatsoever to get back on his side of the road, he replied: "No sir." He estimated that the two pedestrians, apparently referring to the point at which he passed them, were "approximately a hundred feet" from the place were the collision occurred. He admitted on cross-examination that, in making a statement to the state trooper several days after the accident, he did not tell the trooper that the two pedestrians were or that either of them was on the "hard road." On cross-examination the defendant was asked the following questions and made the following replies:

"Q. But you never did—when you got to that curve you kept going, at all times on the wrong side of the road, didn't you?

"A. Yes, sir. I was on the wrong side of the road.

"Q. And when you passed the girls you did not blow your horn, did you?

"A. No, sir. I didn't.

"Q. You saw no reason to blow your horn.

"A. No."

Mrs. Frances Daniels, one of the two pedestrians, as a witness for the defendant testified that she was eighteen years old at the time of the trial; that she was seventeen years old and weighed about ninety pounds at the time of the accident; that the other pedestrian was Barbara Reed, who was twelve years old, and about the same size as the witness at the time of the accident; that Barbara Reed was in Washington

at the time of the trial; and that, as the defendant's automobile approached, she and Barbara were walking side by side. When she was asked on direct examination about the width of the berm on that side of the highway, the following questions and answers ensued:

"A. Well, it was wide enough. We was out of the road, if that is what you mean.

"Q. Were you out of the road?

"A. Yes, sir.

"Q. At the time he passed you?

"A. Oh, yes.

\*　　\*　　\*

"Q. Now, do you know whether or not this little girl with you at all times that this car was in sight had also been on the shoulder, or had she been on the road part of the time?

"A. I am not sure of that.

\*　　\*　　\*

"Q. Was this little girl in your care?

"A. Well, not exactly; but she was younger than I was, so I take care of her when she is with me.

"Q. Well, did you perform any act with her relating to her safety as cars came along, or not?

"A. Oh, yes. I always did.

"Q. What did you do?

"A. I grabbed hold of her and put her on the other side of me.

"Q. Now, as this car approached you do you recall whether or not you did that with her at that time?

"A. Yes, sir."

On cross-examination, the witness was asked the following questions and gave the following answers:

"Q. Did either you, or your companion younger than you, who you were looking out for—did either of you get in the hard road when Mr. Taylor got near you, so as to require him to swerve around to miss you?

"A. No, sir.

"Q. Are you possitive of that?

"A. I am positive.

\*     \*     \*

"Q. Now, as you were walking along with your companion when Mr. Taylor was coming closer and passing you, did either of you get on the hard top of the road?

"A. No, sir.

"Q. Did you at all times stay on the dirt of the road?

"A. Yes, sir.

\*     \*     \*

"Q. You said something about grabbing the arm of the child with you. Now, where was the child when you did this?

"A. I am not—I said I didn't know for sure, but now I think she was off on the dirt.

"Q. And you can tell this jury with certainty that neither of you were in the hard road when this car passed you?

"A. Neither of us was in the hard road."

In appraising the testimony of this witness, we should bear in mind that she was a witness for the defendant and the only witness other than the defendant himself who testified concerning the position of the two pedestrians in relation to the edge of the paved portion of the highway at the time the defendant approached and passed them. Though a party cannot impeach a witness called by him, he is not bound by

all such witness says. He may prove the material facts by other evidence, even though the effect of it is to directly contradict his own witness. *Stout v. Sands,* 56 W. Va. 663, pt. 2 syl., 49 S. E. 428; *Culp v. Virginian Railway Co.,* 80 W. Va. 98, pt. 3 syl., 92 S. E. 236; 58 Am. Jur., Witnesses, Section 797, page 442. While it was proper for the defendant to give testimony which contradicted or tended to contradict the previous testimony of his own witness, Frances Daniels, in reference to the position of the two pedestrians in relation to the edge of the pavement, his uncertain testimony on that point could not reasonably be regarded as sufficient to outweigh or override the positive, certain and repeated statements of his own witness, Frances Daniels, that she and her companion were not at any time on the pavement immediately before and at the time the defendant passed them.

The only other witnesses who testified for the defendant were Loretta Stover and her mother, Barbara Stover. Loretta Stover testified that she was "a distant cousin" and neighbor of the defendant and also a first cousin of the defendant's wife. She testified that, in an automobile operated by her, she and her mother, traveling in the same direction as the defendant, passed the scene of the accident shortly before it occurred and that, at a point about one-tenth of a mile from the scene of the subsequent collision, the plaintiff in his automobile passed her; that the plaintiff's automobile was over in the middle of the road and going fast; and that, as a consequence, she "had to leave the highway" and to swerve out of the way, "off on to the shoulder." She estimated that the plaintiff's automobile "was going beyond sixty." When asked on direct examination whether she observed "any young people on the side of the road", as she approached the scene of the accident, she stated: "I passed too many children walking along the road." When asked how many pedestrians there were, she replied: "I will just say more than one, but I don't know how many." On cross-examination, she

stated that pedestrians were on the "hard road" and that she "had to pull around them." When asked where, in relation to the scene of the accident, she passed them, she replied: "I don't remember." During the early part of her testimony when she was being interrogated relative to the manner in which the plaintiff's automobile was being operated, counsel for the plaintiff objected to "this line of questions * * * the whole line of questions," and it was agreed and understood that this objection would relate to all testimony of this character. Such testimony, therefore, was admitted over the objection of the plaintiff.

Barbara Stover testified that she and the defendant were "about third cousins" and that she was a "niece by marriage" of the defendant's wife; and that she did not know where the accident occurred other than it occurred somewhere "on Maple Fork." She then proceeded to testify, somewhat in corroboration of the testimony of her daughter, that an automobile "pushed us off the road, that is, off over on to the dirt or berm of the road;" but that she was unable to describe the other automobile, to identify its driver or to state where the incident occurred. Counsel for the plaintiff stated: "We renew the same objection, and move to strike this evidence." The objection and motion were overruled. The witness further testified as follows: "* * * Just before this car there was two or maybe three, oh, maybe teenage girls, somewhere around twelve or thirteen years of age * * * that was walking on the road facing us."

At the conclusion of the testimony of Barbara Stover, counsel moved the court to strike her testimony on the ground that it was "entirely too vague and indefinite and remote as to time and place as to be of any probative force whatsoever, and there is no real identity of the party or car." The court, in overruling the motion, stated that, standing alone, her testimony should not have been admitted but that it was "corroborative in some degree" of the testimony of Loretta

Stover and that the objection to the testimony went to its weight rather than to its admissibility. Thereupon counsel for the plaintiff moved the court to strike the testimony of Loretta Stover, the daughter, and to instruct the jury to disregard it. In that connection counsel stated: "* * * I want specifically to point out that whether or not this car may have run her out of the road, or crowded her at some point in the road at least one-tenth of a mile from the scene of the accident is not proper evidence of how the plaintiff might have been driving at another place in the road quite separate from that, and especially since it is agreed that where the accident happened he was completely at all times on his side of the road, * * *."

Because of its character of remoteness and uncertainty, the admissibility of the testimony of Barbara Stover is quite questionable. The testimony of both this witness and that of her daughter to the effect that the automobile which passed them was proceeding in an improper position in the highway was of quite doubtful propriety for reasons stated by counsel in support of his motion to strike the testimony of Loretta Stover. This Court has held that where speed of a motor vehicle involved in a collision is a pertinent factor at a subsequent trial, "the question whether testimony as to the speed of one of the vehicles at some point on the highway before it reached the scene of the accident should be admitted is left to the sound discretion of the trial court." *Poe v. Pittman,* 150 W. Va. 179, pt. 8 syl., 144 S. E. 2d 671. While the defendant asserts in this case that the plaintiff's speed was excessive immediately before the collision, there is no contention, and no basis in the evidence for a contention, that the collision was in any sense or degree caused by the plaintiff's vehicle having been in any position on the highway other than where it had a right to be.

While the action of the trial court in admitting and in not excluding the testimony of these two witnesses was assigned as error in the motion to set aside the

verdict, such matters have not been assigned as error in this Court either in the petition for appeal or in briefs of counsel. These rulings of the trial court, not being jurisdictional in character and not having been assigned as error in the petition for appeal, will not be reviewed by this Court. *Bloyd v. Scroggins,* 123 W. Va. 241, pt. 1 syl., 15 S. E. 2d 600; *Holmes v. Basham,* 130 W. Va. 743, 754, 45 S. E. 2d 252, 258; *Gardner v. Gardner,* 144 W. Va. 630, 636, 110 S. E. 2d 495, 499; 1 M. J., Appeal and Error, Section 210, page 631; Code, 1931, 58-5-3; Rule VI(2), Rules of this Court. Nevertheless, in considering the question of the sufficiency of all the evidence, we are permitted to consider the character of the testimony of these two witnesses in determining the weight which should be accorded to it.

The first witness for the plaintiff, whose testimony we have referred to previously, was Trooper Richard A. Perry, a member of the Department of Public Safety, who arrived at the scene shortly after the collision occurred. He testified that, several days after the accident, the defendant made and signed a statement as follows: ''I was driving down the Maple Fork Road going to my home at Clear Creek. There were two girls walking toward me near the side of the road or on the edge of the road. I laid over to the left of the roadway. I guess I must have laid over too far, because I saw this car coming in the other direction but couldn't get back on my side in time to prevent the collision.''

The next witness for the plaintiff was his brother, Douglas Lilly, a high school student eighteen years of age at the time of the trial, who was riding as a passenger on the right side of the front seat of the plaintiff's automobile at the time of the collision. Seated between the two brothers on the front seat was their niece, Kathy Barley, twelve years of age, who was living in North Carolina at the time of the trial. Douglas Lilly testified that, before the accident, the plaintiff's automobile was proceeding ''around thirty-five or forty''; that he first saw the defendant's auto-

mobile when it was approaching "on our side" at a distance he estimated to have been the length of the courtroom; that his brother applied his brakes and "we started sliding"; that, following the collision, the defendant came to the plaintiff's automobile; that the plaintiff there inquired of the defendant: "What in God's name were you trying to do?"; and that the defendant replied that he "didn't know, he must have went to sleep." On cross-examination, the witness testified that, in approaching the scene of the collision, a "short distance" from that point, the plaintiff's automobile had rounded a curve to its right and "then down into dip" but that after coming out of the "dip", the automobile "was on the straight" when the collision occurred.

Carlos E. Lilly, Jr., testifying in his own behalf, was, according to the record before us, the third and last witness for the plaintiff. He was twenty-three years of age at the time of the trial. His version of the facts and circumstances leading to the collision is stated in the following answers made by him to questions propounded on direct examination:

"Well, right there at the area of the accident I noticed his car. It was over on my side of the road somewhat, but I couldn't tell for sure. There was a little knoll there in the road, and I couldn't tell for sure until I got right up on it, right up on the knoll towards it, and he swayed right over on my side and never offered to cut back or anything, and we hit head on.

\* \* \*

"Well, from the time I saw him he was starting over on my side. Wandering over on my side. And as I hit my brakes—\* \* \* and by the time we hit he was completely on my side. He hadn't cut back in any way.

\* \* \*

"Well, you could see the top of the car. The way the road is there you could see the top of the car,

but I couldn't judge on which side of the road the car was on until I got on up closer, and I seen he was wandering on my side of the road, so when I hit my brakes he never did slow down, and I slid right into him right heavy."

The evidence discloses that all occupants of the two vehicles were injured. The plaintiff testified that, after the collision, he inquired of the defendant: "What in God's name were you doing?" He stated that the defendant replied: "I don't know. I must have went to sleep." On cross-examination, the plaintiff testified that, as he approached the point of the collision, he proceeded through a "dip" in the road, and that when at that place, "you couldn't judge too good from the bottom of it." In another answer, he stated: "You might be able to see the top of the car, but * * * as far as judging which side of the road it would be in you couldn't. * * *" He testified that he was traveling at "an average speed" as he proceeded into the "dip" and that "you couldn't do much over thirty-five or forty through there." He was unable to estimate the rate of the speed of the defendant's automobile as it approached him. He testified that he was unable to get his vehicle stopped completely and that both vehicles were still in motion at the time they collided. He could not recall having met "anybody anywhere near this accident," and he could not recall any incident such as that concerning which Loretta Stover and Barbara Stover testified.

At the conclusion of the plaintiff's testimony in chief, the jury, on motion of the plaintiff, was taken to view the scene of the accident.

At the time of the accident, the defendant was proceeding to his home from the place of his employment, where he had worked about twenty months as a coal miner. With the exception of nine months when he lived in Detroit, he had lived in this general area during all his life. He testified that this was the road on which he customarily traveled in going to and re-

turning from work and that most of it was a "winding road." The evidence in its entirety discloses that the road is comparatively narrow and winding and, in places, unlevel. When asked on cross-examination why he swerved to his left in passing the pedestrians, the defendant made the following rather unresponsive reply: "I had been following a school bus down there. Of course, school was not in session then, but school children had been traveling along the road, and different times I had practically stopped until they got out of the road." In other words, the defendant was not unaccustomed to the presence of pedestrians on or along this road in the course of his previous travels over it. In the operation of his automobile, he was charged with knowledge of all the normal hazards of travel on this highway. We may assume that, as he drove his vehicle to his left, he was aware of the fact that ahead of him there was a depression or "dip" in the road which was sufficient in its nature and character to render difficult or impossible his view of any vehicle which might be approaching him from that area.

There is no contention that the two pedestrians suddenly came to their position on or near the pavement ahead of the defendant or that they suddenly or abruptly changed their position in any respect in reference to the edge of the highway. The defendant does not contend that the pedestrians suddenly came in his view. On cross-examination, he testified that, as he approached the pedestrians, the road was straight for a "little distance" and that there was nothing to prevent his seeing them. The evidence discloses that he had time and opportunity to act with deliberation and forethought in passing the pedestrians. He makes no contention to the contrary. He admits that he gave the pedestrians no audible signal which might have induced them to change their position as they approached him and that he was not conscious of any reason for doing so. It is quite obvious, we believe, that if the defendant had continued to travel on his proper

side of the highway, there would have been no emergency created by the presence of the pedestrians on or near the edge of the pavement and by the approach of the plaintiff's automobile, even at an excessive speed, as it came out of the depression in the highway.

As we have stated previously, the defendant testified that in approaching the pedestrians, he was traveling at a speed of thirty-five miles an hour. He did not adopt a course of reducing the speed of his vehicle or giving a warning signal to the pedestrians in an effort to pass them in his own proper traffic lane. He does not contend that this course would have been unwise or impossible. On the contrary, though he was not certain that either of the pedestrians was on the pavement, the defendant merely proceeded to the left of the center of the highway and, upon being confronted with the plaintiff's vehicle approaching wholly within its proper lane, the defendant was unable to get his vehicle back to its proper side of the highway. In his effort to do so, he obviously lost control of his vehicle so that it proceeded to its left side of the highway.

In a personal injury action, a party will not be permitted to rely on the sudden emergency doctrine if his own negligence created, in whole or in part, a situation which is alleged by him to have created a sudden emergency. *Poe v. Pittman,* 150 W. Va. 179, pt. 2 syl., 144 S. E. 2d 671. It is true that the issue of sudden emergency is a jury question where the evidence concerning that issue is conflicting or where such evidence, though undisputed, is such that different inferences may reasonably be drawn therefrom. *Poe v. Pittman,* 150 W. Va. 179, pt. 4 syl., 144 S. E. 2d 671. There is no substantial dispute in the evidence bearing on the sudden emergency issue in this case and, we believe, no proper basis for a factual determination that the defendant was confronted with a sudden emergency which was not created in whole or in part by his own negligence. We are of the opinion, therefore, that

the trial court erred in submitting the sudden emergency issue to the jury.

Contributory negligence is an affirmative defense and the burden is on the defendant to prove it, though the evidence in its entirety is to be considered in determining whether the burden has been met. *Leftwich v. Wesco Corp.*, 146 W. Va. 196, pt. 6 syl., 119 S. E. 2d 401; *Jackson v. Cockill*, 149 W. Va. 78, pt. 4 syl., 138 S. E. 2d 710. In considering the negligence of a plaintiff or of a defendant in a case such as this, the law, on the question of causation, looks to proximate cause rather than remote cause. *McKinney v. Miller*, 138 W. Va. 324, 75 S. E. 2d 854; *Anderson v. Baltimore & Ohio Railroad Co.*, 74 W. Va. 17, pt. 2 syl., 81 S. E. 519; *Liston v. Miller*, 113 W. Va. 730, 734, 169 S. E. 398, 400; *Fawcett v. Railway Co.*, 24 W. Va. 755, pt. 1 syl.; 13 M. J., Negligence, Section 23, page 533.

Proximate cause is difficult to define and, therefore, the question of the presence or the absence of proximate cause must be determined largely from the facts of the particular case. *Evans v. Farmer*, 148 W. Va. 142, 149, 133 S. E. 2d 710, 715; *Whitney v. Myers Contracting Corp.*, 146 W. Va. 130, 134, 118 S. E. 2d 622, 624. ''The proximate cause of an injury is the superior or controlling agency from which springs the harm, as contradistinguished from those causes which are merely incidental or subsidiary to such principal and controlling cause.'' *Stuck v. Kanawha & Michigan Railway Co.*, 76 W. Va. 453, pt. 6 syl., 86 S. E. 13. To the same effect, see *Webb v. Sessler*, 135 W. Va. 341, pt. 4 syl., 63 S. E. 2d 65, and *Reese v. Lowry*, 140 W. Va. 772, 790, 86 S. E. 2d 381, 390-91.

''The general rule that there can be no recovery where the negligence of the plaintiff and defendant concur to produce the injury is subject, however, to the qualification that where the negligence of the defendant is the proximate cause of the injury, and that of the plaintiff only a remote cause of the injury, the plaintiff may recover, notwithstanding his negli-

gence." 13 M. J., Negligence, Section 29, page 544. "Remote negligence of the plaintiff will not prevent his recovery for an injury immediately caused by the negligence of the defendant. The negligence of the plaintiff, which defeats his recovery, must be a proximate cause of the injury." *Tompkins v. The Kanawha Board,* 21 W. Va. 224, pt. 4 syl. To the same effect, see *Blaine v. C. & O. R. R.,* 9 W. Va. 252, pt. 9 syl.; *Sheff v. The City of Huntington,* 16 W. Va. 307, pts. 7 and 8 syl.; *Washington v. The B. & O. R. R. Co.,* 17 W. Va. 190, pt. 5 syl.; *Carrico v. West Virginia Cent. & P. Ry. Co.,* 39 W. Va. 86, pt. 8 syl., 19 S. E. 571; *Crum v. Ward,* 146 W. Va. 421, 438, 122 S. E. 2d 18, 28.

There is no substantial dispute in the evidence bearing upon the issue of contributory negligence. In the light of the authorities previously referred to, we are of the opinion that, even if the plaintiff was negligent in operating his automobile at an excessive rate of speed immediately preceding the accident and even if his negligence in this respect contributed to the cause of the accident and his consequent personal injuries and property damage, such negligence was a remote cause and the negligence of the defendant was the immediate and proximate cause of the accident. We are of the opinion, therefore, that the trial court erred in submitting to the jury the issue of contributory negligence.

Instructions dealing with the issues of contributory negligence and sudden emergency, not being warranted by the evidence, should have been refused. *Frye v. Norton,* 148 W. Va. 500, pt. 6 syl., 135 S. E. 2d 603.

The testimony discloses that, at the time of the accident involved in this case, the plaintiff was transporting two automibile tires for delivery to another person. On cross-examination of Douglas Lilly, counsel for the defendant, over the objection of counsel for the plaintiff, persisted in inquiring whether these tires were "racing car slicks" of a type used on "racing cars" and whether the plaintiff was en route to a

certain home "to work on a racing car." The implications raised by this line of questioning were flatly denied by both this witness and by the plaintiff. No testimony was subsequently adduced in behalf of the defendant to support the implications thus raised. We are of the opinion that the trial court erred in permitting counsel to persist in this line of questioning. Inasmuch as the judgment must be reversed on other grounds, we need not decide whether the error was prejudicial.

We have carefully considered other assignments of error made in behalf of the plaintiff but are of the opinion that they are without merit.

We are of the opinion that the verdict of the jury is not sustained by the evidence and that, therefore, it must be set aside. *Quality Bedding Co. v. American Credit Indemnity Co. of N. Y.,* 150 W. Va. 352, pt. 3 syl., 145 S. E. 2d 468; *Lester v. Flanagan,* 145 W. Va. 166, pt. 3 syl., 113 S. E. 2d 87; *Muldoon v. Kepner,* 141 W. Va. 577, pt. 1 syl., 91 S. E. 2d 727.

For reasons stated in this opinion, the judgment of the Circuit Court of Raleigh County is reversed, the verdict of the jury is set aside and a new trial is awarded.

*Judgement reversed;*
*verdict set aside;*
*new trial awarded.*